[L.A. No. 31785. Dec. 31, 1986.]

ROBERT SUNDANCE et al., Plaintiffs and Appellants, v.
THE MUNICIPAL COURT FOR THE LOS ANGELES JUDICIAL
DISTRICT OF LOS ANGELES COUNTY et al.,
Defendants and Respondents;
THE PEOPLE, Real Party in Interest and Respondent.

**COUNSEL**

Timothy B. Flynn, Carlyle W. Hall, Jr., Lucas Guttentag, Joel R. Reynolds, Fredric D. Woocher, Michael S. Gendler, Eric Havian and Bruce Williamson for Plaintiffs and Appellants.

Fred Okrand, Mark Aaronson, Margaret C. Crosby, Alan L. Schlosser, Amitai Schwartz, Peter Barton Hutt and James A. Toupin as Amici Curiae on behalf of Plaintiffs and Appellants.

John H. Larson, County Counsel, Philip S. Miller, Deputy County Counsel, Ira Reiner, City Attorney, James H. Pearson, Senior Assistant City Attorney, and Denise M. Beaudry, Deputy City Attorney, for Defendants and Respondents.

George Agnost, City Attorney (San Francisco), and Kathryn A. Pennypacker, Deputy City Attorney, as Amici Curiae on behalf of Defendants and Respondents.

No appearance for Real Party in Interest and Respondent.

---

**OPINION**

**THE COURT.**[*]—This action, filed by four public inebriates and one taxpayer, challenges California's drunk in public statute (Pen. Code, § 647, subd. (f)[1]) on numerous Eighth Amendment and due process grounds.[2] Plaintiffs seek an order enjoining enforcement of section 647(f) in light of many alleged constitutional abuses attendant upon enforcement of the statute in Los Angeles County. They also seek an order mandating referral of all public inebriates to civil detoxification centers in lieu of criminal prosecution. (See § 647, subd. (ff).)[3] Finally, plaintiffs argue that section 647(f) must be enjoined as a waste of public funds.

Section 647(f) provides that every person who is "found in any public place under the influence of intoxicating liquor . . . in such a condition that he or she is unable to exercise care for his or her own safety or the safety of others, or by reason of his or her being under the influence of intoxicating liquor . . . interferes with or obstructs or prevents the free use of any street, sidewalk, or other public way" is guilty of disorderly conduct, a misdemeanor. However, public inebriates arrested under this provision can be diverted into treatment facilities as an alternative to criminal prosecution. Under section 647(ff) "[w]hen a person has violated [section 647(f)], a peace officer, if he or she is reasonably able to do so, shall place the person, or cause him or her to be placed, in civil protective custody. Such person shall be taken to a facility, designated pursuant to Section 5170 of the

---

[*]Before Bird, C. J., Mosk, J., Broussard, J., Reynoso, J., Grodin, J., and Lucas, J.

[1]All further statutory references are to the Penal Code unless otherwise noted. For purposes of brevity, section 647, subdivision (f) will be referred to as section 647(f).

[2]Defendants/respondents are the City of Los Angeles (City), the County of Los Angeles (County), the Municipal Court of the Los Angeles Judicial District and its presiding judge, the Chief of Police of the Los Angeles Police Department, the Los Angeles County Sheriff, the Los Angeles City Attorney, and the individual members of the Los Angeles County Board of Supervisors.

[3]Hereafter, section 647, subdivision (ff) will be referred to as section 647(ff).

Welfare and Institutions Code,[4] for the 72-hour treatment and evaluation of inebriates. A peace officer may place a person in civil protective custody with that kind and degree of force which would be lawful were he or she effecting an arrest for a misdemeanor without a warrant. No person who has been placed in civil protective custody shall thereafter be subject to any criminal prosecution or juvenile court proceeding based on the facts giving rise to such placement."[5]

## I.

Excluding traffic arrests, violation of section 647(f) is the highest volume crime in the County.[6] In 1975, the year in which the complaint in this case was filed, the Los Angeles Police Department (LAPD) made 50,595 section 647(f) arrests. These arrests constituted 32.1 percent of the LAPD's total misdemeanor arrests for that year. The relevant statistics for the Los Angeles County Sheriff's Department (LASD) were 9,875 section 647(f) arrests, constituting 28.4 percent of the LASD's annual misdemeanor arrests.

Because of the high volume of section 647(f) arrests, and because such arrests are generally made during a "sweep" of a "skid row" area, law enforcement agencies have developed specialized methods of arresting and processing public inebriates. The LAPD utilizes a "Short Form Arrest Report" in making such arrests.

The arrest report consists of a form upon which the arresting officer checks off the "objective symptoms" of drunkenness observed during the arrest. The narrative portion of such reports generally reads as follows: "Defendant observed drunk in public unable to care for himself." A carbon copy of the arrest report serves as the misdemeanor complaint filed against the section 647(f) arrestee.

---

[4]Section 5170 of the Welfare and Institutions Code provides as follows: "When any person is a danger to others, or to himself, or gravely disabled as a result of inebriation, a peace officer, member of the attending staff, as defined by regulation, of an evaluation facility designated by the county, or other person designated by the county may, upon reasonable cause, take, or cause to be taken, the person into civil protective custody and place him in a facility designated by the county and approved by the State Department of Alcohol and Drug Abuse as a facility for 72-hour treatment and evaluation of inebriates."

[5]Section 647(ff) also provides that the following persons cannot be taken to civil detoxification facilities: "(1) Any person who is under the influence of any drug, or under the combined influence of intoxicating liquor and any drug. [¶] (2) Any person who a peace officer has probable cause to believe has committed any felony, or who has committed any misdemeanor in addition to subdivision (f) of this section. [¶] (3) Any person who a peace officer in good faith believes will attempt escape or will be unreasonably difficult for medical personnel to control."

[6]The following statement of facts is based upon the trial court's findings of fact issued at the conclusion of the eight-week trial below.

Although the arresting officers work in pairs, only one officer signs the arrest report and the name of the other officer is not noted on the form. Similarly, the names of civilian witnesses are not included on the arrest report. No physical evidence, such as alcoholic beverage containers, is preserved. Section 647(f) arrestees do not undergo field sobriety examinations or chemical tests of intoxication.

The LASD does not utilize short form arrest reports in making section 647(f) arrests. However, like the LAPD, the LASD does not preserve physical evidence or note the names of percipient witnesses. Similarly, the LASD does not conduct field sobriety examinations or chemical tests of intoxication.

The LAPD typically uses police step-vans or "B-wagons" to transport section 647(f) arrestees to its Parker Center jail, where most section 647(f) arrestees are detained. The vans consist of windowless, closed, steel compartments equipped with wooden benches and rear double-doors for loading passengers.

The reasonable capacity of such vans is 10 to 12 upright passengers. Police policy allows only 10 passengers per van unless the van is summoned to pick up additional passengers on its return trip to the jail. Nevertheless, B-wagons often arrive at the jail carrying 14 to 15 passengers. No prisoner is allowed to remain in B-wagon transport for more than one hour.

Many section 647 arrestees transported in B-wagons are unable to care for themselves. However, there is no way to secure such passengers within the van to keep them from being jostled and thrown about in transit. Therefore, arrestees sometimes arrive at the jail with injuries caused by B-wagon transport. In addition, arrestees are occasionally injured as a result of fights between B-wagon passengers during transport.

Section 647(f) arrestees picked up by the LAPD commonly suffer from medical problems upon arrival at the Parker Center jail. Withdrawal symptoms such as shaking, nausea, and vomiting are common. No medical screening is performed upon arrestees when they arrive at the jail. Only those with obvious medical need are inspected.

Upon arrival at the jail, section 647(f) arrestees are processed through booking, which includes a search, a property inventory, an identification interview, and fingerprinting. During these procedures the arrestees are held in various holding tanks and processing areas, none of which have beds.

After booking, and until taken to court or released, the arrestees are held in drunk tanks which have a single toilet, drinking fountain, and wash basin.

The tanks, which hold a maximum of 40 prisoners, are often filled to capacity. The tanks have no beds or other furnishings, and arrestees are given no pillows or other bedding.[7] Showers are rarely provided.[8]

There are two statutory alternatives to criminal processing of section 647(f) arrestees. The first is referral to a 72-hour civil detoxification facility. If there is room in the civil detoxification facility the public inebriate is taken there immediately after arrest, pursuant to the mandate of section 647(ff). However, there is only one such facility in the County.

Because of its limited capacity, the civil detoxification center can accept a maximum of 20 referrals a day. Only 9,629 persons were referred to the facility in 1975 and 1976, as compared to the 105,658 persons who were arrested and booked by the LAPD for violation of section 647(f) during those years. The decision whether to refer a public inebriate to the civil detoxification facility depends upon the vacancy rate of the facility, not upon the status or condition of the arrestee.

The second alternative to criminal processing is release pursuant to section 849, subdivision (b)(2).[9] This statute allows a police officer to release an arrestee from custody if the arrest was made without a warrant and the arrestee "was arrested for intoxication only, and no further proceedings are desirable." Prior to July 8, 1977, section 849(b)(2) was routinely utilized only when the jail facilities were full. The arrestees who had been held the longest were released to make room for new prisoners.

On July 8, 1977, the LAPD promulgated Special Order 23, which set forth a new policy for release of section 647(f) arrestees. Under this new policy all section 647(f) arrestees are to be released after a minimum period of incarceration of four hours, unless there is a particular reason for denying release. After implementation of Special Order 23, more than 90 percent of all section 647(f) arrests resulted in "kick-outs" under section 849(b)(2).

All section 647(f) arrestees who are not referred to the civil detoxification facility or released pursuant to section 849(b)(2) remain in custody unless they post the standard $50 bail or qualify for "own recognizance" release.

---

[7]Some section 647(f) arrestees are injured due to falls or seizures that occur during booking or during detention in a holding tank or drunk tank.

[8]The transportation and prearraignment detention facilities employed by the LASD differ substantially from those utilized by the LAPD. The LASD does not use B-wagons. Instead, it picks up section 647(f) arrestees in radio patrol cars. The arrestees are detained in the jail facilities at the arresting officer's substation. They are housed in regular cells. If the arrestee needs medical care he is taken to a contract hospital.

[9]Hereafter, section 849, subdivision (b)(2) will be referred to as section 849(b)(2).

The majority of these section 647(f) arrestees are in custody at the time of arraignment. For example, in 1976, 84 percent of the section 647(f) arrestees booked into the Parker Center jail remained in custody until arraignment. Of the 16 percent released, 14 percent posted bail and 2 percent were released on their own recognizance.

Section 647(f) arrestees who remain in custody are transported to the metropolitan arraignment court and incarcerated in a large holding tank pending arraignment. Some of the arrestees are still intoxicated at the time of arraignment and others are suffering various symptoms of withdrawal.

The arraignment court's medical facilities consist of one small room with a nurse in attendance. None of the drugs used to treat the symptoms and complications of withdrawal are available. If a prisoner is undergoing seizures or delirium tremens, he is placed on a gurney. However, because there is only one gurney, additional prisoners needing medical attention must lie on the cement floor. There is no medical observation or monitoring of arrestees conducted by trained personnel. If a prisoner acutely needs medical attention he is taken to the county hospital.

At arraignment, section 647(f) arrestees are admonished, *en masse,* of their constitutional rights to counsel, to trial, to confront witnesses and to be free from compulsory self-incrimination. They are informed that a guilty plea will be deemed to be a waiver of all rights. They are told that they are charged with "public intoxication," but are not informed of the elements of the section 647(f) offense.

Municipal judges and commissioners also fail to notify section 647(f) arrestees that they have the right to demand a probable cause hearing upon a plea of not guilty. In addition, the short form arrest reports typically do not provide factual support for a finding that there is probable cause to believe that the arrestee violated section 647(f).

Most section 647(f) defendants enter their pleas without the assistance of counsel and without making an express, on-the-record waiver of counsel. However, section 647(f) arrestees are told that a public defender will be appointed to represent them before they plead if they cannot afford to retain counsel. Generally, counsel is not appointed unless the arrestee makes an affirmative request for such appointment.

Virtually no section 647(f) defendants go to trial. The primary cause of the absence of trials is the fact that most section 647(f) arrestees plead guilty. For example, in 1974, 99 percent of all section 647(f) arrestees in

Los Angeles County pleaded guilty. The guilty plea rate for other misdemeanor arrestees in the County is generally about 70 percent.

Section 647(f) arrestees often plead guilty for reasons unconnected to guilt or innocence. Since section 647(f) arrestees usually cannot post bail or secure release on their own recognizance, they must remain incarcerated pending trial upon a plea of not guilty. Trials for such defendants are generally set from 21 to 25 days after arraignment.

In contrast, in the years 1973 through 1976, the average sentence imposed upon a guilty plea at arraignment ranged from five to eight days. During the trial of this action, the average jail sentence was only 1.87 days. Therefore, arrestees can expect to spend less time incarcerated if they plead guilty than if they exercise their right to trial.

There are two other reasons for the prevalence of guilty pleas. First, a section 647(f) defendant is almost always offered a sentence of "time-served" in exchange for a guilty plea on the day of trial. This is true whether the defendant has been in custody since arraignment or was only incarcerated for a few days due to bail or own recognizance release.

Second, more than half of all section 647(f) cases still pending on the day of trial are dismissed "in furtherance of justice" pursuant to section 1385.[10] Such dismissals commonly occur because (1) the arresting officer fails to appear; (2) he appears but has no independent recollection of the arrest and the short form arrest report fails to refresh his recollection; or (3) the prosecutor concludes that the arresting officer's testimony would not establish that the defendant was so intoxicated that he could not "care for his or her own safety or the safety of others." (§ 647(f).)

The inability of the arresting officer to remember a particular arrest is understandable in light of the great volume of such arrests made by a small number of officers assigned to Team 12 of the Central Division of the LAPD. This team has primary responsibility for patrolling "skid row" and makes a substantial number of the section 647(f) arrests. An individual officer may make as many as 3,000 or 4,000 such arrests per year.

The officer's inability to recall the arrest is a product of both the high volume of arrests and the failure to include a narrative statement of the

---

[10]Section 1385 provides as follows: "The judge or magistrate may, either of its own motion or upon the application of the prosecuting attorney, and in furtherance of justice, order an action to be dismissed. The reasons of the dismissal must be set forth in an order entered upon the minutes. No dismissal shall be made for any cause which would be ground of demurrer to the accusatory pleading."

arrest on the short form arrest report. Moreover, because evidence is not preserved, field sobriety examinations or chemical tests are not performed, and the names of witnesses are not noted, the officer's recollection is the only basis for prosecution.

The virtual absence of section 647(f) trials in the County is evidenced by the following statistic. In the years 1974 through 1976, 95,738 section 647(f) charges were filed in the metropolitan division of the municipal court. Only 28 of these cases went to trial. Eight trials resulted in conviction.

In addition to its findings regarding the arrest and criminal processing of section 647(f) arrestees, the trial court made numerous factual findings regarding the disease of alcoholism. Although the cause of alcoholism is still unknown, there is now a medical consensus that alcoholism is a separate disease entity. According to the National Council on Alcoholism: "Alcoholism is a chronic, progressive and potentially fatal disease. It is characterized by tolerance and physical dependency or pathologic organ changes, or both—all the direct or indirect consequences of the alcohol ingested."

One sign of the disease is the tolerance/withdrawal phenomenon. As the alcoholic drinks larger quantities of alcohol his body undergoes physical changes that enable him to absorb large quantities of alcohol and continue functioning. When an alcoholic has reached the stage of tolerance, withdrawal occurs when ingestion of alcohol ceases. The symptoms of withdrawal include anxiety, "shakes," nausea and weakness. Moreover, some life-threatening conditions, including seizures, delirium tremens, liver failure, cardiomyopathy, and hypoglycemia can occur. Withdrawal symptoms last from one to several days.

Another characteristic of alcoholism is the "loss of control" phenomenon. Alcoholics organize their lives around alcohol consumption and are unable to stop drinking despite the negative effects alcohol has on their health and general well-being. Medical authorities agree that this phenomenon is physiological. An alcoholic facing withdrawal without assistance will return to drinking to avoid the unpleasant symptoms of withdrawal. Once the alcoholic starts drinking, he is psychologically and physiologically unable to control the amount he drinks.

Many alcoholics also cannot refrain from appearing in public while intoxicated. First, a significant number of alcoholics suffer from organic brain syndrome, which impairs their judgment and prevents them from controlling their behavior. Other alcoholics are unable to refrain from appearing in public because they are indigent and homeless.

The trial court also found that the treatment of alcoholism has progressed substantially throughout the United States in the last 10 years. In most states alcoholics are treated as persons suffering from a disease; they are not treated as criminals. Typically they are arrested and diverted into civil detoxification facilities where they are encouraged to enroll in long-term treatment programs.

Initial medical screening by trained personnel is crucial to the detoxification process. Many diseases associated with alcoholism are masked by intoxication. Without proper screening, the existence of such conditions can go unrecognized. The detoxification process also requires ongoing medical monitoring by trained personnel. In addition to the medical emergencies that arise due to withdrawal, alcoholics may need emergency medical treatment for other acute medical conditions associated with alcoholism.

The first stage of detoxification lasts for about 24 hours. It involves medical screening and the provision of proper nourishment, clean clothes, and sleeping facilities. The second phase of the detoxification process lasts from two to three days. During this period the counselors at the facility, usually recovered alcoholics, try to convince the patients to enter into a long-term treatment facility.

The success rate achieved by these methods, even among "hard-core" alcoholics, has been significant. The experts agree that long-term remission of alcoholism is possible, but not without a change in the alcoholic's attitude toward drinking and the continued assistance of others to provide support for that attitude.

On the other hand, the trial court found that "[t]here is no satisfactory approach that can be made to the cure of alcoholism as such in a jail setting" because the voluntary decision to quit drinking is inconsistent with involuntary residence in a jail. Also, the jail setting is not appropriate for treatment because successful treatment requires education and sociological support. Moreover, the time spent in jail is usually insufficient to begin the long-term treatment necessary to recovery.

In sum, the trial court concluded that the penal system "has no positive effect on rehabilitating alcoholics" and does not deter them from drinking. In fact, according to the trial court, the medical consensus is that "prosecution of public inebriates often has a counter-productive effect." Understandably, almost all groups and individuals knowledgeable about alcoholism, including most of the defendants in this action, favor decriminalization of public inebriation.

On the basis of the above-described findings of fact, the trial court granted injunctive relief in favor of plaintiffs. First, the trial court enjoined the City and its police chief (hereafter City defendants) from incarcerating section 647(f) arrestees under conditions that do not meet the following standards:

(1) Individual medical screening and evaluation must be performed by a person trained to recognize the medical problems of alcoholics including diseases associated with alcoholism and the complications attendant upon withdrawal from alcohol. Such screening must be performed under the operational supervision of a physician. For the first 90 days following judgment, medical screening must be performed within 180 minutes after jail intake. Thereafter, the screening must be performed within 90 minutes of intake.

In addition, the trial court ordered the City defendants to monitor, at least every hour, the condition of those arrestees who appear to be in need of special attention. As to those section 647(f) arrestees who present medical abnormalities or require emergency care, the City defendants were ordered to provide for immediate transfer to a hospital.

(2) Within the first four hours of custody, section 647(f) arrestees must be given a "nutritious sugar-containing product." Regardless of the regularly scheduled mealtimes, all section 647(f) arrestees must be offered at least one meal while in custody. Arrestees who are released under section 849(b)(2) must be given the option of waiting in a "sober tank" until the next scheduled meal, or receiving a box lunch upon release.

(3) During the booking process padded benches or cots must be provided to section 647(f) arrestees. Arrestees may not be held in a "drunk tank" for more than 20 minutes, and no more than 6 arrestees may be held in a tank at one time.

(4) Within 90 days of the judgment, chemical tests must be conducted on each section 647(f) arrestee against whom a complaint will be filed. Chemical tests must also be provided to those arrestees who request such testing prior to, during, or within an hour of booking.

(5) The floors, walls, and benches of all B-wagons must be padded within 90 days of the judgment. Only 10 arrestees may be transported in a B-wagon at one time. No arrestee may be transported in a B-wagon for more than 30 minutes after arrest.

The trial court also granted injunctive relief against the County and its sheriff (hereafter County defendants). The trial court enjoined the County

defendants from incarcerating any section 647(f) arrestees in the holding tanks of the central district of the municipal court unless adequate beds, cots, or chairs are provided for all ill defendants.

The trial court reserved jurisdiction to "amplify, modify, supplement, amend, or terminate" its injunctive relief. The court also appointed two medical experts to investigate compliance with the court's orders regarding City and County detention facilities. The experts were directed to prepare a report on the "medical adequacy of the procedures, facilities and staffing actually utilized and implemented by the City and County defendants for the processing of [s]ection 647(f) arrestees and pre-trial detainees . . . ."

The trial court also granted declaratory relief "respecting the rights and duties" of various parties. First, the trial court held that insufficient arrest procedures—failure to record both the names of percipient witnesses and the facts indicating violation of section 647(f)—could lead to a violation of due process where "it is unlikely that the arresting officer will be able to recall the facts at the time of trial without refreshing [his] memory." Second, the trial court declared that the right to counsel, jury trial, confrontation, and the right to be free from compulsory self-incrimination must be individually and expressly waived. A guilty plea after a mass admonition does not constitute such a waiver.

Third, the trial court stated that the elements of the offense must be explained to section 647(f) arrestees prior to acceptance of their pleas. The admonition may be made *en masse*.

The trial court also held that section 647(f) arrestees have a right to a probable cause hearing conducted under the procedures set forth in *In re Walters* (1975) 15 Cal.3d 738 [126 Cal.Rptr. 239, 543 P.2d 607]. Arrestees may be informed *en masse* of this right to a probable cause hearing. When police reports are used to establish probable cause, the report must establish a factual basis for each element of the offense. Finally, the trial court held that an in-custody defendant has the right to go to trial on a section 647(f) charge within five days of arraignment unless he knowingly and intelligently waives his right to do so.

The trial court rejected the argument that section 647(f) was unconstitutional on its face, but held that the statute violates the cruel and/or unusual punishment clauses of the state and federal Constitutions as applied to certain chronic alcoholics. Specifically, the trial court held that a chronic alcoholic has a constitutional defense to a section 647(f) charge if he proves by a preponderance of the evidence that he is "(1) unable to refrain from drinking alcohol to the point where he is [un]able to care for himself or others, and

(2) unable (a) by reason of the disease, or (b) indigency, to refrain from being in public while intoxicated." The court held that the existence of the constitutional defense does not bar the police from arresting public inebriates upon probable cause that they have violated section 647(f).[11]

The trial court denied taxpayer plaintiff Burt M. Rushforth's request for an injunction to prevent waste of public resources. The trial court also refused to grant injunctive relief against the members of the county board of supervisors and the Los Angeles County Municipal Court and its presiding judge.

## II.

The core of plaintiffs' challenge to section 647(f) consists of various claims that the statute on its face or as applied to chronic, homeless alcoholics violates the cruel and unusual punishment clause of the Eighth Amendment to the United States Constitution and the cruel or unusual punishment clause of article I, section 17 of the California Constitution. ■ Initially, plaintiffs argue that section 647(f) is unconstitutional on its face because arrest and incarceration of chronic alcoholics for the crime of public inebriation lacks penological justification.

*Penological Justification*

This argument is based upon language found in several opinions of the United States Supreme Court. The high court has found that punishment violates the cruel and unusual punishment clause of the Eighth Amendment

---

[11]Since defendants do not challenge the trial court's finding that section 647(f) is unconstitutional as applied to certain chronic alcoholics, this court expresses no view as to the propriety of that finding.

Although defendants accept the existence of the constitutional defense, plaintiffs challenge the trial court's order, contending that the trial court erred in allocating the burden of proving the constitutional defense. Since due process demands that the prosecution bear the burden of proving all elements of the offense (*People v. Tewksbury* (1976) 15 Cal.3d 953, 963 [127 Cal.Rptr. 135, 544 P.2d 1335]), and the constitutional defense negates mens rea, plaintiffs assert that the accused need only raise a reasonable doubt as to the existence of the constitutional defense to section 647(f). Defendants counter that the constitutional defense "has no relation to the elements of the crime set forth in the statute." Therefore, according to defendants, the constitutional defense to a section 647(f) charge is a special defense, like entrapment, and the accused bears the burden of proving its existence by a preponderance of the evidence.

This court need not resolve this dispute in this case because the issue is presented only in the abstract. The underlying proceeding was not a section 647(f) prosecution in which the accused could have raised the defense, but a civil action seeking an order enjoining enforcement of the statute. Moreover, as plaintiffs contend, the constitutional defense will rarely be invoked given the paucity of section 647(f) trials. (See *post,* at p. 1132.)

if it is "grossly out of proportion to the severity of the crime" (*Coker* v. *Georgia* (1977) 433 U.S. 584, 592 [53 L.Ed.2d 982, 989, 97 S.Ct. 2861]), or involves "the unnecessary and wanton infliction of pain" (*Gregg* v. *Georgia* (1976) 428 U.S. 153, 173 [49 L.Ed.2d 859, 875, 96 S.Ct. 2909]). Among the punishments that inflict unnecessary pain are those that lack penological justification. (*Rhodes* v. *Chapman* (1981) 452 U.S. 337, 346 [69 L.Ed.2d 59, 68, 101 S.Ct. 2392].) "[T]he sanction imposed cannot be so totally without penological justification that it results in the gratuitous infliction of suffering." (*Gregg* v. *Georgia, supra,* 428 U.S. at p. 183 [49 L.Ed.2d at p. 880].)

The application of the penological justification argument urged by plaintiffs is a novel one. As with Eighth Amendment challenges generally, the penological justification argument has been discussed in the context of challenges to the conditions of confinement or the severity of the sentence imposed. (See *id.,* at pp. 182-183 [49 L.Ed.2d at pp. 879-880]; *Coker* v. *Georgia, supra,* 433 U.S. at pp. 591-592 [53 L.Ed.2d at pp. 988-989]; *Rhodes* v. *Chapman, supra,* 452 U.S. at pp. 344-346 [69 L.Ed.2d at pp. 67-69].) The argument has not been urged as a basis for prohibiting the states from punishing certain conduct criminally. Moreover, plaintiffs cite to no cases in which a court has found incarceration or any other punishment to be so "purposeless" that it constitutes cruel and unusual punishment.

Nevertheless, relying on the trial court's findings regarding the proper treatment of the disease of alcoholism and the effect of criminalizing public drunkenness, plaintiffs argue that arrest and prosecution of chronic alcoholics furthers no valid penological purpose. As discussed above (see *ante,* at pp. 1114-1115) the trial court made extensive findings about the nature of alcoholism and the effect of criminalizing public inebriation. Most significantly, the trial court found that prosecution has no rehabilitative or deterrent effect upon chronic alcoholics.

Despite these findings, plaintiffs' argument fails as a facial attack on the statute. The trial court's findings apply only to chronic alcoholics, while the statute applies to all members of the public. The trial court was not presented with evidence that section 647(f) cannot deter nonalcoholics from appearing in public in a state of severe intoxication. Therefore, even if plaintiffs' penological justification argument has merit, it would apply only to chronic alcoholics who cannot be deterred from violating section 647(f). It would not serve as a basis for enjoining enforcement of the statute.

*Excessive Punishment*

■ Plaintiffs attack section 647(f) as applied on the ground that enforcement of the statute against chronic alcoholics results in punishment

that is "so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." (*In re Lynch* (1972) 8 Cal.3d 410, 424 [105 Cal.Rptr. 217, 503 P.2d 921].) Plaintiffs do not contend that either the maximum statutory sentence or the sentences actually imposed for individual violations of section 647(f) are excessive. Instead, they argue that in the aggregate, as a result of repeated arrests for violation of section 647(f), chronic alcoholics are incarcerated for excessive amounts of time. Plaintiffs claim, based on the histories of the named chronic alcoholic plaintiffs in this case, that public inebriates may spend as much as 50 to 97 percent of their adult lives in jail.

However, the three cases that plaintiffs rely upon to support their excessive punishment claim involve successful challenges to either the statutory penalty or the penalty actually imposed for an individual violation of a criminal statute. (See *In re Lynch, supra,* 8 Cal.3d at pp. 415-417; *In re Foss* (1974) 10 Cal.3d 910, 916 [112 Cal.Rptr. 649, 519 P.2d 1073]; *In re Rodriguez* (1975) 14 Cal.3d 639, 642-643 [122 Cal.Rptr. 552, 537 P.2d 384].) They do not present cruel or unusual punishment challenges based upon a series of sentences considered in the aggregate. Therefore, the punishment inflicted for violation of section 647(f) is not unconstitutional under the rationale of these cases.

The statutory maximum sentence for violation of section 647(f) is six months. The average sentence imposed upon conviction of section 647(f) in the County during the years 1973 through 1976 was five to eight days. While this case was in trial, from May 9, 1977, through August 29, 1977, the average sentence was 1.87 days.

Plaintiffs do not contend that the actual or statutory penalties for individual violations of section 647(f) are so excessive as to shock the conscience or offend fundamental notions of human dignity. Instead, plaintiffs argue that individual sentences for violation of section 647(f) must be viewed in the aggregate. In support of this argument plaintiffs rely on *In re Foss, supra,* 10 Cal.3d 910.

The defendant in *Foss* was sentenced to 10 years to life. During the first 10 years he was statutorily ineligible for parole because he had previously been convicted of possession of heroin. (*Id.,* at p. 916.) This court held that the sentence violated the California Constitution's cruel or unusual punishment clause. The *Foss* court followed the test developed in *In re Lynch, supra,* 8 Cal.3d at page 425, and found that the nature of the offense and the offender did not warrant a 10-year sentence, in part because "the mandatory minimum term precluding parole consideration for 10 years . . . fail[s] to consider the extent to which the addict's repetition of proscribed

behavior is attributable to his addiction." (*Foss, supra,* 10 Cal.3d at p. 923.)

The holding in *Foss* involved a statutorily mandated aggravated term. The court specifically limited its holding to an "increased punishment for a further offense." (*Id.,* at p. 922.) *Foss* does not bar the infliction of punishment for repeated violations of a statute, even if the continuing violations are caused by addiction. ■ "Each separate offense involves a punishable *actus reus* and the repetition of such acts provides a basis other than status upon which to impose sanctions." (*Id.,* at pp. 922-923; see also *id.,* at p. 922 ["each of the overt acts for which the drug offender is convicted may be independently proscribed"].)

■ Accordingly, *Foss* does not conflict with the trial court's holding that "[i]n determining whether a sentence is so severe as to violate the Cruel and/or Unusual Punishment Clauses, sentences for violation of the same crime may not be cumulated." This court agrees with the trial court and finds that punishment of chronic alcoholics for repeated violations of section 647(f) does not amount to excessive punishment in violation of the state or federal Constitutions.

*Arbitrary Enforcement Practices*

■ Plaintiffs also challenge section 647(f) under the Eighth Amendment on the ground that defendants' "arrest, incarceration, prosecution, conviction and sentencing practices are arbitrary, capricious, and random in their operation."

First, plaintiffs contend that teams of officers are sent to downtown "skid row" areas, but not to other areas, to arrest public inebriates. Second, plaintiffs complain that the timing and location of the arrest, not the condition of the individual arrestee, dictate whether he will be sent to a civil detoxification center, released pursuant to section 849(b)(2), or booked and held pending arraignment. Third, plaintiffs argue that defendants' enforcement of section 647(f) discriminates on the basis of wealth because when an arrestee who posts bail fails to show up at arraignment or trial, no bench warrant is issued and the criminal case is effectively terminated. Finally, plaintiffs contend that section 647(f) arrestees who have posted bail invariably receive time-served sentences in exchange for their guilty pleas on the day of trial. Because these arrestees have been free pending trial, their time-served sentences are generally one-eighth as long as those inflicted upon arrestees who do not have the resources to post bail.

Plaintiffs' overall claim of arbitrary enforcement practices relies solely on *Furman* v. *Georgia* (1972) 408 U.S. 238 [33 L.Ed.2d 346, 92 S.Ct.

2726], which reversed judgments of death in two rape cases and one murder case on cruel and unusual punishment grounds. Four of the justices, in separate opinions, relied in part on the fact that the death penalty, which was rarely imposed, was inflicted arbitrarily. Justice Douglas was particularly concerned that the discretion vested in the judge or jury allowed for discriminatory imposition of death sentences. (*Id.,* at pp. 255-257 [33 L.Ed.2d at pp. 358-360] (conc. opn. of Douglas, J.).) Justice Stewart noted that death sentences were probably imposed in a discriminatory manner, on the basis of race. (*Id.,* at pp. 309-310 [33 L.Ed.2d at pp. 389-390] (conc. opn. of Stewart, J.).)

Plaintiffs' reliance on *Furman* is misplaced. Three of plaintiffs' four claims of arbitrary practices involve pretrial situations. They do not present the problem discussed in *Furman*—arbitrary infliction of punishment after conviction.

Plaintiffs point to only one alleged abuse that is arguably governed under the arbitrariness rationale discussed in *Furman.* Plaintiffs contend that harsher sentences are imposed upon public inebriates who cannot make bail than are imposed upon public inebriates who post bail. This argument is similar to the concern expressed by four of the justices in *Furman* that the death penalty is arbitrarily imposed because "there is no meaningful basis for distinguishing the few cases in which it is imposed from the many cases in which it is not." (*Furman, supra,* 408 U.S. at p. 313 [33 L.Ed.2d at p. 392] (conc. opn. of White, J.); see also *id.,* at p. 249 [33 L.Ed.2d at p. 355] (conc. opn. of Douglas, J.); *id.,* at p. 274 [33 L.Ed.2d at p. 369] (conc. opn. of Brennan, J.); *id.,* at pp. 309-310 [33 L.Ed.2d at pp. 389-390] (conc. opn. of Stewart, J.).) It also echoes the suspicions of discriminatory infliction of punishment raised by Justices Douglas and Stewart.

However, *Furman* concerned the death penalty, a penalty that is unique in kind and is the most severe penalty that our judicial system may impose.

None of the four justices in *Furman* who discussed arbitrary infliction of punishment implied that arbitrary or wholly discretionary imposition of sentences other than death would violate the Eighth Amendment. Instead, the justices relied on the uniqueness of the death penalty among criminal sanctions. (See, e.g., *Furman, supra,* 408 U.S. at p. 295 [33 L.Ed.2d at pp. 381-382] (conc. opn. of Brennan, J.) ["strong probability that an unusually severe and degrading punishment is being inflicted arbitrarily"]; *id.,* at p. 310 [33 L.Ed.2d at p. 390] (conc. opn. of Stewart, J.) ["Eighth and Fourteenth Amendments cannot tolerate the infliction of a sentence of death under legal systems that permit this unique penalty to be so wantonly and freakishly imposed"].) Therefore, the reasoning of the various opinions

in the *Furman* case is of little assistance in evaluating the penalty imposed for violation of section 647(f). That penalty is neither unique nor severe.

Plaintiffs cite no authority other than *Furman* to support their contention that defendants' sentencing practices violate the Eighth Amendment. Accordingly, this court rejects plaintiffs' argument that the arbitrariness they point to constitutes cruel and unusual punishment.

*B-Wagon Transport*

■ ■ ■ ■ ■ Plaintiffs also argue that enforcement of section 647(f) violates the cruel and/or unusual punishment clauses of the federal and state Constitutions because defendants' enforcement practices demonstrate "deliberate indifference to serious medical needs of prisoners" proscribed by the Eighth Amendment. (*Estelle* v. *Gamble* (1976) 429 U.S. 97, 104 [50 L.Ed.2d 251, 260, 97 S.Ct. 285].)[12] According to plaintiffs, this "deliberate indifference" is epitomized by the use of "overcrowded, unsafe, and unsanitary B-wagons."

The trial court agreed with plaintiffs that B-wagon transport was unsafe. Therefore, it enjoined the City from using B-wagons unless the floors, benches, and walls were padded, the maximum capacity of the B-wagon was limited to 10 prisoners, and the period of transportation was reduced to a maximum of 30 minutes. Plaintiffs maintain that this relief is insufficient. They contend that the City should be completely enjoined from using B-wagons to transport section 647(f) arrestees.

Plaintiffs do not dispute the trial court's findings of fact that served as the basis for its limited relief. Instead, they argue that "adequate padding" and a "slight reduction in capacity" fail to afford enough relief. To support this contention plaintiffs rely on the report and supplemental report that were filed by the court-appointed medical experts one year after the trial court judgment was entered. ■ The reports were the subject of plaintiffs'

---

[12]This contention is technically a due process challenge. "[T]he State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law. Where the State seeks to impose punishment without such an adjudication, the pertinent constitutional guarantee is the Due Process Clause of the Fourteenth Amendment." (*Ingraham* v. *Wright* (1977) 430 U.S. 651, 671-672, fn. 40 [51 L.Ed.2d 711, 730, 97 S.Ct. 1401]; see also *Bell* v. *Wolfish* (1979) 441 U.S. 520, 535, fn. 16 [60 L.Ed.2d 447, 466, 99 S.Ct. 1861].) Since pretrial detainees cannot be punished at all, they are entitled at a minimum to be free from cruel and unusual punishment. (See *Hampton* v. *Holmesburg Prison Officials* (3d Cir. 1976) 546 F.2d 1077, 1079-1080.) Therefore, some courts have held explicitly that "a detainee is entitled to protection from cruel and unusual punishment as a matter of due process . . . ." (*Rhem* v. *Malcolm* (2d Cir. 1974) 507 F.2d 333, 337.)

motion to augment the record on appeal. Since the Court of Appeal granted that motion, the reports are properly before this court.

 The medical experts determined that although the padding constitutes an improvement, it does not serve to prevent injury from slips and falls within B-wagons. The B-wagons still provide no means of securing passengers so that they are not jostled or thrown about while the B-wagon is in motion. Moreover, the relief ordered provides no means of protecting a passenger from the assaultive conduct of other passengers. Finally, space and ventilation within a B-wagon are inadequate for 10 passengers, and the step used to enter and exit a B-wagon is too narrow and far from the ground to be safely used by intoxicated persons.

Although plaintiffs' discussion of the reports of the medical experts makes a convincing case for enjoining the use of B-wagons, that decision is more properly left to the trial court. The trial court expressly reserved jurisdiction to "amplify, modify, supplement, amend or terminate" its orders regarding the transportation and incarceration of section 647(f) arrestees in light of the report of the medical experts. The trial court, having considered this question in the first instance, is in the best position to determine the effect of the experts' reports upon its original order.

*County Prearraignment Detention Facilities*

 The trial court enjoined the City defendants from incarcerating section 647(f) arrestees absent individual medical screening and evaluation by a person trained to recognize the medical complications attendant upon alcoholism. The trial court also ordered the City defendants to monitor "those arrestees who apparently, by reason of their state of consciousness, or other apparent medical requirements including medical care made necessary by withdrawal, need to be monitored periodically." The trial court did not grant such relief against the County defendants. Plaintiffs contend that like City jails, the County facilities used to house public inebriates arrested by the LASD violate constitutionally mandated medical standards necessary to meet the needs of section 647(f) arrestees.

Plaintiffs rely on the following findings of fact regarding the County defendants' procedures for processing section 647(f) arrestees. "Persons arrested for violation of section 647(f) who are 'down' [conscious or semi-conscious] are checked by the arresting officer to determine if hospitalization appears to be required. If so, they are taken to a 'contract hospital;' if not, they are taken to the geographic jail at the arresting officer's sub-station. In at least two of the substation jails (East Los Angeles and Altadena)

there is no medical staff or dispensary, and all medical screening and on-going observation and monitoring, if any, is performed by jail personnel."

Trial testimony indicates that in making section 647(f) arrests, sheriff's deputies perform some sort of medical screening to determine whether hospitalization of the inebriate is warranted. However, there is no testimony to the effect that the sheriff's deputies are properly trained to undertake this task. As to those arrestees who are transported to a sheriff substation upon arrest, it appears that they may not receive adequate medical attention. The record indicates that medical screening is not performed in all the sheriff substations. Even if it were performed, there is no evidence that the jail personnel at those substations are trained to deal with the medical problems of chronic alcoholics.

The trial court found that City jail facilities lacking trained personnel failed to meet the medical needs of section 647(f) arrestees. Therefore, in spite of the fact that County facilities and procedures were found to be superior to those of the City, the trial court may have erred in failing to grant injunctive relief against the County defendants. This matter will be remanded to the trial court to consider whether the County defendants should be enjoined from incarcerating section 647(f) arrestees in jail facilities that do not offer medical screening and monitoring performed by trained personnel.

*Dehabilitative Enforcement Practices*

Plaintiffs also argue that defendants' enforcement practices constitute cruel and unusual punishment because the Eighth Amendment prohibits the incarceration of section 647(f) arrestees under conditions that are dehabilitative or counterproductive. Plaintiffs rely on *Pugh* v. *Locke* (M.D. Ala. 1976) 406 F.Supp. 318, in which the district court held that "[w]hile courts have thus far declined to elevate a positive rehabilitation program to the level of a constitutional right, it is clear that a penal system cannot be operated in such a manner that it impedes an inmate's ability to attempt rehabilitation, or simply to avoid physical, mental or social deterioration." (*Id.,* at p. 330; see also *Finney* v. *Arkansas Board of Correction* (8th Cir. 1974) 505 F.2d 194, 209 ["lack of rehabilitative programs could, in the face of 'other conditions,' be violative of the Eighth Amendment"]; but see *Newman* v. *State of Ala.* (5th Cir. 1977) 559 F.2d 283, 291 [same cause as *Pugh* v. *Locke, supra*].)

Plaintiffs' argument is supported by the trial court's finding that "[p]rosecuting public inebriates through the penal system has no positive

effect on rehabilitating alcoholics. Generally accepted medical opinion is that prosecution of public inebriates often has a counter-productive effect."

However, the authorities relied upon by plaintiffs are inapposite. *Pugh* v. *Locke* involved prison conditions. The same standard should not apply to the incarceration of public inebriates for short periods of time. County jails, which serve primarily as detention centers, are neither intended nor equipped to provide rehabilitative services. (See *McGinnis* v. *Royster* (1973) 410 U.S. 263, 273 [35 L.Ed.2d 282, 290, 93 S.Ct. 1055].) Also, the "other conditions" present in *Finney* v. *Arkansas Board of Correction, supra,*— arduous labor conditions, threats of physical and mental abuse, and lack of free time—are not present here. (See *Finney* v. *Arkansas Board of Correction, supra,* 505 F.2d at p. 209.)

Accordingly, to the extent that criminal prosecution of chronic alcoholics under section 647(f) has a dehabilitative effect, such prosecution does not constitute cruel and unusual punishment.[13]

*Constitutional Right to Treatment*

Plaintiffs also argue that section 647(f) arrestees have a constitutional right to treatment during pretrial detention. Therefore, section 647(f) arrestees must be taken to civil detoxification facilities upon arrest.

This argument depends upon an analogy to civil commitment cases. These cases hold that a person who is involuntarily committed on the basis of a mental or physical condition has a constitutional right to treatment while incarcerated. "[I]nvoluntary confinement for the 'status' of having a mental or physical illness or disorder constitutes a violation of the cruel and unusual punishment clauses of both the state and federal Constitutions . . . unless it is accompanied by adequate treatment." (*People* v. *Feagley* (1975) 14 Cal.3d 338, 359 [121 Cal.Rptr. 509, 535 P.2d 373]; see also *Ohlinger* v.

---

[13]Practically speaking, plaintiffs' "dehabilitation" argument would require that section 647(f) arrestees be sent to civil detoxification facilities. Plaintiffs argue that under *Swansey* v. *Elrod* (N.D. Ill. 1975) 386 F.Supp. 1138, transfer to a civil detoxification center is constitutionally required because the special needs of chronic alcoholics cannot be met in a jail setting. As the trial court found, "[t]he custodial setting is not appropriate for treatment of an alcoholic because an important ingredient of the treatment is to give such a patient hope, sociological support, and education. This cannot be done effectively in a jail setting."

However, *Swansey* is applicable only to the detention of juveniles. *Swansey* noted that juveniles are different from adults and they are entitled to a higher standard of custodial care. (*Id.,* at p. 1143.) Therefore, the court in *Swansey* held that even those juveniles that have been transferred to adult jurisdiction are entitled during pretrial detention to a more adequate standard of care than that accorded adults. This court declines to hold that the "difference" between chronic alcoholics and other prisoners requires that section 647(f) arrestees be detained in civil detoxification facilities.

*Watson* (9th Cir. 1981) 652 F.2d 775, 778 ["a person committed solely on the basis of his mental incapacity has a constitutional right to receive 'such individual treatment as will give [him] a realistic opportunity to be cured or improve his . . . mental condition'"]; *Wyatt* v. *Aderbolt* (5th Cir. 1974) 503 F.2d 1305.)

In light of the fact that there are virtually no section 647(f) trials in the County, plaintiffs contend that the only purpose of pretrial detention of section 647(f) arrestees is protective custody. According to plaintiffs, protective custody constitutes incarceration for a mental or physical condition and is analogous to civil commitment.[14]

Plaintiffs' argument lacks merit. Arrest and incarceration pursuant to section 647(f) occurs absent any finding that the particular arrestee is a chronic alcoholic in need of treatment. Instead, public inebriates are arrested and held on the basis of their alleged commission of acts proscribed by a valid penal statute. Even where a section 647(f) arrestee is "kicked out" under section 849(b)(2) without being charged with a crime, the short period of pretrial detention is attendant upon enforcement of a criminal statute.

The Legislature has determined that public intoxication is a crime if the intoxicant is "unable to exercise care for his own safety or the safety of others." (§ 647(f).) Although public inebriates must be placed in "civil protective custody" if possible (see § 647(ff)), this alternative to criminal prosecution is rarely invoked in the County because it has only one facility that qualifies under section 647(ff) as "designated pursuant to section 5170 of the Welfare and Institutions Code, for the 72-hour treatment and evaluation of inebriates." (*Ibid.*) Therefore, although, as the trial court concluded, public intoxication is not viewed as a "real" crime, public inebriates are picked up and detained under the authority of a penal statute, and are processed through the criminal justice system.

As the trial court concluded, the criminal justice system has thus been "distorted out of shape" in order to deal with the problem of public intoxication. This fact is illustrated by the virtual absence of section 647(f) trials and the fact that the vast majority of section 647(f) arrestees are never arraigned, but are released pursuant to section 849(b)(2). While this state of affairs demonstrates the advisability of civil protective custody in lieu of criminal prosecution of public inebriates, it does not support plaintiffs' argument that pretrial detention of section 647(f) arrestees in the County is civil in nature.

---

[14]Plaintiffs "right to treatment" argument is not directed toward postconviction incarceration of section 647(f) arrestees.

### III.

Plaintiffs also argue that defendants' section 647(f) enforcement practices result in numerous due process violations.[15]

*Arraignment Practices*

First, plaintiffs attack defendants' arraignment practices. They contend that defendants fail to provide section 647(f) arrestees with valid admonitions of their constitutional rights, and fail to elicit voluntary and intelligent waivers of those rights. Plaintiffs further allege that no "probable cause" hearings are provided section 647(f) arrestees after arraignment.

The trial court agreed that the arraignment procedures applied to section 647(f) arrestees, most of whom are in custody, fail to meet due process standards. The trial court found that although section 647(f) arrestees are informed of their constitutional rights at arraignment, the admonitions are presented to the group of arrestees, *en masse,* and express, on-the-record waivers are not taken. Instead, section 647(f) arrestees are informed that their guilty pleas will be deemed a waiver of all rights. The trial court also determined that section 647(f) arrestees are not given an explanation of the elements of their alleged offense.

The trial court found these procedures unacceptable and granted declaratory relief against the Los Angeles County Municipal Court and its presiding judge. The trial court declared that when a section 647(f) arrestee pleads guilty, his waiver of the right to counsel, right to trial, right to confront his accusers and right to be free from compulsory self-incrimination "must be expressly and individually stated or declared on the record by the defendant to the Court." The trial court also held that prior to the taking of a guilty plea the defendant must be informed of the elements of the offense.

The trial court also agreed with plaintiffs that there was a "consistent failure" on the part of defendant municipal court to inform section 647(f) defendants of their right to a judicial "probable cause" determination following arraignment on a misdemeanor charge. The trial court held that this "consistent failure" constitutes a violation of due process. (See *In re Walters,*

---

[15]Many of plaintiffs' due process claims involve the criminal processing of section 647(f) arrestees prior to the adoption of Special Order 23 two weeks before this case went to trial. While the number of section 647(f) arrestees against whom charges are filed and who consequently endure criminal processing has dropped dramatically since the promulgation of Special Order 23, the trial court found that defendants' arraignment and other processing procedures have not changed. Therefore, although the magnitude of the problem has been reduced, plaintiffs' claims are not moot.

*supra,* 15 Cal.3d 738.) Therefore, the trial court granted declaratory relief finding that each defendant in custody at the time of arraignment who pleads "not guilty" is entitled to a probable cause hearing if he so requests. Although defendants must be given notice of their right to such a hearing, notice can be given *en masse* in accordance with *Mills* v. *Municipal Court* (1973) 10 Cal.3d 288, 303 [110 Cal.Rptr. 329, 515 P.2d 273].

The trial court also held that if the police report is to be the basis of the probable cause finding, the report must establish a factual basis for each element of the offense. An arrest report that states merely that the arrestee was found in public unable to care for himself or others is insufficient to support a finding of probable cause.

Defendants do not contest the trial court's conclusion that their arraignment practices violate due process. Nor do they challenge the relief fashioned by the trial court in an effort to remedy the due process abuses. Therefore, this court need not decide whether the trial court correctly decided these issues.

*Right to Trial*

Similarly, this court need not determine whether the trial court erred in accepting plaintiffs' contention that section 647(f) arrestees are systematically denied their right to trial. In reaching this conclusion the trial court relied primarily on the fact that over a 3-year period only 28 out of 95,738 section 647(f) cases, or .029 percent, resulted in trial. The primary cause of the absence of trials is the extremely high rate of guilty pleas at arraignment (e.g., 99 percent in 1974).

As the trial court noted, section 647(f) arrestees often plead guilty for reasons unconnected to guilt or innocence. Because section 647(f) arrestees usually cannot post bail or secure release on their own recognizance, they must remain incarcerated pending trial upon a plea of not guilty. The trials are generally set to occur 21 to 25 days after arraignment.

In contrast, in the years 1973 through 1976, the average sentence imposed upon a guilty plea at arraignment ranged from five to eight days. During the trial of this action, between July 9 and August 29, 1977, the average sentence was only 1.87 days. Therefore, the expectation of a short period of incarceration often results in a guilty plea.

As to those section 647(f) defendants who plead not guilty at arraignment, the lack of trials has two primary explanations. First, section 647(f) de-

fendants are routinely offered a sentence of "time-served" in exchange for a plea of guilty on the day of trial. Second, in over half the cases the prosecutor moves for dismissal under section 1385 ("in furtherance of justice") at the time set for trial.[16]

Dismissal is often necessary because the LAPD uses short form arrest reports and does not note the identity of witnesses, retain evidence, or administer either field sobriety tests or chemical tests of intoxication. In addition, certain police officers routinely make so many section 647(f) arrests that they have no independent recollection of the accused. Given the nature of the arrest report, the officers have nothing with which to refresh their recollection. Thus, the prosecutor often must dismiss the case because the evidence is insufficient to obtain a conviction.[17]

In light of these facts, the trial court agreed with plaintiffs that section 647(f) arrestees were systematically denied their right to trial. "A combination of the circumstances found in the findings of fact (i.e., dismissals pursuant to Penal Code section 1385, failure to preserve evidence including observations of facts, and a long pretrial wait to obtain a trial which will never occur because of the above or because the sentence will in fact be served before trial) has led, for all practical purposes, to a denial of the right to trial for the bulk of public inebriates charged in the central arraignment court."

To remedy this problem the trial court granted declaratory relief in two respects. First, the trial court found that the LAPD's arrest procedures, including the failure to record the identity of percipient witnesses and the officers' observations, leads in a significant number of cases to a denial of due process and the right to trial. Second, the trial court declared that, absent waiver, section 647(f) arrestees must be brought to trial within five days of arraignment.

Plaintiffs argue on appeal, however, that the trial court's remedy is inadequate. Noting the short sentences generally accorded section 647(f) arrestees and the inability of such arrestees to make bail or qualify for own recognizance release, plaintiffs argue that even if an arrestee could go to trial within five days of arraignment, he would be sorely tempted to plead

---

[16]For the text of section 1385, see *ante,* at page 1113, footnote 10.

[17]Not all dismissals are the result of insufficient arrest procedures. Some section 647(f) cases are, like other cases, dismissed simply because the arresting officer fails to appear. Also, even assuming sufficient arrest and evidence-gathering procedures, some section 647(f) cases would still be dismissed under section 1385 because such cases are by their nature hard to prove. Indeed, the trial court found that "proving that the defendant was unable to care for himself, or is a hazard to the safety of others, or was blocking a public way might in a significant percentage of the cases be difficult for the prosecution to prove."

guilty. Plaintiffs claim that this incentive to plead guilty results in the coercion of guilty pleas.

This court does not agree. As plaintiffs allege, lenient sentencing policies in the context of section 647(f) may result in a situation in which the right to trial is rarely exercised. However, this fact does not demonstrate that guilty pleas are coerced. ▮▮▮ This court declines to depart from the general rule that a guilty plea is not rendered involuntary because it is entered with the expectation of receiving a lighter sentence than would be imposed after trial. (See *Brady* v. *United States* (1970) 397 U.S. 742, 749-752 [25 L.Ed.2d 747, 757-759, 90 S.Ct. 1463].)

▮▮▮ Plaintiffs also argue generally that the trial court's remedies for the "systemic constitutional deficiencies" are inadequate because the due process abuses can never be eliminated from section 647(f) cases. The trial court, plaintiffs argue, ignored the root of the problem. Chronic alcoholism is a "widespread health problem" that cannot be dealt with by arrests and prosecutions. The conduct of the LAPD demonstrates that the police themselves do not believe that the criminal justice system is an appropriate way to deal with the problem. The result is, as the trial court stated, that the "criminal system [is] being distorted out of shape in an attempt to efficiently achieve social goals for which the system is not designed."

The trial court's remedies, plaintiffs argue, are piecemeal relief for a systemic problem. The due process abuses that result from the fact that section 647(f) violations are not treated as "real" crimes cannot be eliminated by more formal arraignment procedures or even by a five-day trial date. These remedies will have no effect upon the LAPD's practice of arresting chronic alcoholics and releasing them hours later, without ever instituting charges, pursuant to section 849(b)(2).

In addition, plaintiffs argue that the trial court's recognition of the constitutional defense is equally ineffective. The overwhelming majority of section 647(f) arrestees will be released pursuant to section 849(b)(2) prior to arraignment. Even those arrestees who are not released will, in light of the short sentences imposed for violation of the statute, have little incentive to plead not guilty and invoke their right to assert the constitutional defense at trial. Therefore, plaintiffs urge this court to enjoin enforcement of section 647(f) in light of the "totality of the circumstances."

This we decline to do. Although the adoption of Special Order 23 demonstrates that section 647(f) is being utilized less as a penal statute than as a remedy for a social ill, this fact does not justify an order enjoining enforcement of a statute that is not constitutionally infirm on its face. While

this court may agree with plaintiffs that the problem of chronic alcoholism would be more effectively and humanely addressed through the use of civil detoxification facilities, it is the Legislature, not this court, that has the power to provide funding for such facilities.

*Exercise of Prosecutorial Discretion*

██ Finally, plaintiffs also argue that defendants' systematic failure to exercise prosecutorial discretion in section 647(f) cases violates due process. Prior to mid-1975 when this case was filed, defendant city attorney's office routinely filed section 647(f) charges without attempting to screen out cases that could not be successfully prosecuted. The criminal complaints in section 647(f) cases were simply carbon copies of the LAPD's short form arrest report.

After mid-1975, some prosecutorial review was instituted. Plaintiffs argue, however, that this review is very limited, resulting in an artificially low rejection rate. Plaintiffs assert that the city attorney's failure to exercise "meaningful" prosecutorial discretion violates due process. The trial court made no specific findings regarding this claim, and entered no relief against the city attorney's office.

Prosecutors have broad decisionmaking power in charging crimes. (Gershman, Prosecutorial Misconduct (1985) ch. 4, pp. 4-3–4-6.) "The judiciary historically has shown an extraordinary deference to the prosecutor's decision-making function." (*Id.*, at p. 4-5.) Although relief may be available if a defendant can demonstrate selective prosecution (see *Yick Wo* v. *Hopkins* (1886) 118 U.S. 356 [30 L.Ed. 220, 6 S.Ct. 1064]) or vindictive prosecution (see *North Carolina* v. *Pearce* (1969) 395 U.S. 711 [23 L.Ed.2d 656, 89 S.Ct. 2072]), reversals on these grounds are rare. (Gershman, *supra,* at pp. 4-12, 4-35.)

Plaintiffs cite no authority for the proposition that the prosecutor's failure to exercise sufficient, or indeed any, discretion in determining whether to file charges constitutes a denial of due process. Therefore, this court affirms the trial court's decision not to grant injunctive relief against the Los Angeles City Attorney's office.

### IV.

In July of 1977, two weeks before trial, the LAPD adopted Special Order 23. Promulgated pursuant to section 849(b)(2),[18] Special Order 23 provides

---

[18]Section 849(b)(2) provides, in pertinent part: "Any peace officer may release from custody, instead of taking such person before a magistrate, any person arrested without a warrant whenever: . . . [¶] (2) The person arrested was arrested for intoxication only, and no further proceedings are desirable. . . ."

that every section 647(f) arrestee is to be released after a minimum of four hours unless: (1) the arrestee has an outstanding warrant; (2) the arrestee makes a request to be taken before a magistrate; or (3) the arrestee's safety or the safety of others would be jeopardized by his release. In addition, an arrestee will not be released if there are "other specific articulated facts justifying continued detention and/or prosecution."[19] Under the latter justification, an arrestee may be detained if he constitutes a "continuing police problem[]."

Although the trial court found that the typical practices and procedures of the municipal court remained the same after the adoption of Special Order 23, the number of section 647(f) arrestees actually arraigned was greatly reduced. After Special Order 23 was implemented, fully 90 percent of the section 647(f) arrestees were "kicked out" pursuant to section 849(b)(2) prior to arraignment.

Plaintiffs argue that Special Order 23's implementation of section 849(b)(2) "establishes precisely the type of unfettered police discretion that courts consistently condemn." They argue that Special Order 23 "demonstrates that Penal Code [section] 849(b)(2) is unconstitutionally vague." Plaintiffs are particularly concerned that the police officer's decision whether to institute charges is guided only by the "continuing police problem" standard, which gives police too much discretion.

Plaintiffs cite much authority for the proposition that criminal laws must contain specific standards. The cases cited all involve criminal statutes challenged on the ground that the conduct they prohibit is not adequately described. (See, e.g., *Grayned* v. *City of Rockford* (1972) 408 U.S. 104, 107-108 [33 L.Ed.2d 222, 226-227, 92 S.Ct. 2294]; *Smith* v. *Goguen* (1974) 415 U.S. 566, 571-573 [39 L.Ed.2d 605, 610-612, 94 S.Ct. 1242]; *Coates* v. *City of Cincinnati* (1971) 402 U.S. 611, 614 [29 L.Ed.2d 214, 217, 91 S.Ct. 1686].) However, neither Special Order 23 nor section 849(b)(2) is a criminal statute or purports to regulate the conduct of the public.

---

[19]Special Order 23 provides, in part, as follows: "For a number of years, this Department has cooperated in the efforts to establish local detoxification centers as a practical alternative to criminal prosecution of [section 647(f)] arrestees. Until adequate facilities are available, this Department will necessarily continue to arrest and book public inebriates but will not seek prosecution, absent exigent circumstances. . . .

"An adult who is booked *only* for [section 647(f)] (Drunk) shall normally be released under [section 849(b)(2)] after a period of detoxification (minimum of 4 hours) unless one or more of the following reasons exist for non-release:

"The arrestee has a want or warrant.

"The arrestee requests that he be taken before a magistrate.

"The safety of the arrestee or others may be jeopardized by the release.

"There are other specific articulated facts justifying continued detention and/or prosecution."

Therefore, contrary to plaintiffs' assertions, section 849(b)(2) and Special Order 23 do not present the sort of vagueness problems encountered in cases such as *Grayned* v. *City of Rockford*.[20] Since neither statute is a criminal statute that defines prohibited conduct, neither statute fails to provide "the person of ordinary intelligence a reasonable opportunity to know what is prohibited." (*Grayned, supra,* 408 U.S. at p. 108 [33 L.Ed.2d at p. 227].)

Nor can it be said that these provisions "impermissibly delegate[] basic policy matters to policemen, judges and juries . . . ." (*Id.,* at pp. 108-109 [33 L.Ed.2d at p. 228].) The "basic policy matter[]" is the decision whether the conduct described in section 647(f) should be prohibited. This decision has been made by the Legislature. Section 849(b)(2) and Special Order 23 simply provide criteria for the decision whether to prosecute—a decision as to which the executive branch has been accorded wide discretion. (See *People* v. *Superior Court (Greer)* (1977) 19 Cal.3d 255, 262-263 [137 Cal.Rptr. 476, 561 P.2d 1164].)[21]

Finally, there is no suggestion that section 849(b)(2) and Special Order 23 infringe on constitutionally protected activity, or chill the exercise of First Amendment rights.

---

[20]In *Grayned* v. *City of Rockford, supra,* 408 U.S. 104, the United States Supreme Court described the problems that arise where the prohibitions of criminal statutes are not clearly defined. (*Id.,* at p. 108 [33 L.Ed.2d at p. 227].) "Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application." (*Id.,* at pp. 108-109, fns. omitted [33 L.Ed.2d at pp. 227-228].)

These concerns are particularly important in the First Amendment context. "[W]here a vague statute 'abut[s] upon sensitive areas of basic First Amendment freedoms,' it 'operates to inhibit the exercise of [those] freedoms.' Uncertain meanings inevitably lead citizens to '"steer far wider of the unlawful zone" . . . than if the boundaries of the forbidden areas were clearly marked.'" (*Grayned, supra,* 408 U.S. at p. 109, fns. omitted [33 L.Ed.2d at p. 228].)

[21]Plaintiffs also argue that Special Order 23 constitutes "unauthorized assumption by LAPD of legislative and judicial functions." They contend that Special Order 23 is, in effect, a usurpation of the legislative function of "proscribing and establishing public policy."

This court, however, finds that section 849(b)(2) is a valid delegation of authority to the police department (see *Greer, supra,* 19 Cal.3d at pp. 262-263), and that Special Order 23 is an appropriate exercise of that authority. The Legislature determined the fundamental policy issue when it enacted section 849(b)(2) and allowed the police to release section 647(f) arrestees when "no further proceedings are desirable." (§ 849(b)(2).) Special Order 23 merely constitutes the "application and execution of the policy [and] does not constitute legislative delegation." (*Kugler* v. *Yocum* (1968) 69 Cal.2d 371, 377 [71 Cal.Rptr. 687, 445 P.2d 303].)

Plaintiffs also argue that Special Order 23 exacerbates the problems with enforcement of section 647(f) by "effectively shield[ing] LAPD's section 647(f) enforcement practices from meaningful prosecutorial review and judicial oversight." In particular, plaintiffs argue that under Special Order 23, the arrest and detention of public inebriates under section 647(f) is not for the purpose of administration and enforcement of penal laws. Instead, section 647(f) arrestees are held in some sort of "protective custody" or "preventive detention" until they are sober enough to be safely released. Plaintiffs contend that such systematic deprivation of personal liberty violates due process.

Assuming the existence of probable cause, the arrest and initial detention of public inebriates is lawful because section 647(f) is a valid penal statute. Unless the arrestee is not promptly taken before a magistrate or is improperly denied bail or own recognizance release, the initial detention is justifiable pretrial incarceration. The detention is not rendered invalid because the police eventually exercise their discretion under section 849(b)(2) to release the arrestee on the ground that "no further proceedings are desirable." Therefore, in the individual case, the pretrial detention of a section 647(f) arrestee does not violate due process.

However, when section 647(f) arrests are viewed in the aggregate, the situation is more problematic. Under Special Order 23, 90 percent of all section 647(f) arrestees in the County are released without being charged. As a group, the arrests are made without the intention of prosecuting the underlying offense. Therefore, in the context of Special Order 23, it is not just the detention, but also the arrest of public inebriates that raises due process concerns.

Amici American Civil Liberties Union and San Francisco Lawyers' Committee for Urban Affairs advance a fundamental attack on section 647(f) enforcement practices that speaks directly to this concern. They argue that the arrest and detention of public inebriates under section 647(f) is not for the purpose of enforcing the penal law at all. Since 90 percent of arrestees are "kicked out" of the criminal process before any charges are filed, amici argue that the arrests are made in bad faith.[22]

Specifically, amici's argument is as follows. An individual cannot be deprived of personal liberty, a fundamental right, without due process of law. (*Van Atta* v. *Scott* (1980) 27 Cal.3d 424, 434-435 [166 Cal.Rptr. 149,

---

[22]Although amici assert that their argument would be equally valid absent Special Order 23, it is much stronger in light of the 90 percent "kick out" rate resulting from the implementation of that order.

613 P.2d 210].) Although criminal involvement may be a sufficiently compelling reason to deprive a person of liberty, numerous constraints have been applied to protect against arbitrary and unjustified deprivations. For example, arrests must be supported by probable cause. (*Michigan* v. *Summers* (1981) 452 U.S. 692, 700 [69 L.Ed.2d 340, 348, 101 S.Ct. 2587].) The burden of justifying a warrantless arrest is on the police (see *Cervantez* v. *J.C. Penney Co.* (1979) 24 Cal.3d 579, 592 [156 Cal.Rptr. 198, 595 P.2d 975]), and arrests must be based on clear, specific laws which give sufficient notice to both the accused and the police of the conduct which is forbidden. (*Papachristou* v. *City of Jacksonville* (1972) 405 U.S. 156, 162 [31 L.Ed.2d 110, 115, 92 S.Ct. 839].)

Amici contend that these constitutional protections are meaningless when arrestees are never charged. Since there is no review by a neutral and detached judiciary, practices that may result in arrests without probable cause, or other abuses, can continue unchecked. Amici argue that the law should not be powerless to deal with situations like this involving cases that will never enter the judicial system.

Although it may be argued that an individual case of abuse could be remedied by a civil suit for damages, amici argue that it is unrealistic to expect the chronic, homeless alcoholics to whom this section is repeatedly applied to locate a lawyer and institute an action. Furthermore, a jury might award only nominal damages in such an action on the theory that the police were only attempting to remove what many might consider an unaesthetic nuisance from the streets.

Amici rely on cases decided under the bad faith doctrine. ■ This doctrine is applied by federal courts to enjoin state criminal prosecutions commenced without genuine expectation of conviction, for the purpose of harassing defendants and discouraging their exercise of constitutionally protected rights. (See *Dombrowski* v. *Pfister* (1965) 380 U.S. 479 [14 L.Ed.2d 22, 85 S.Ct. 1116]; *Allee* v. *Medrano* (1974) 416 U.S. 802 [40 L.Ed.2d 566, 94 S.Ct. 2191].)

■ For example, in *Allee* v. *Medrano, supra,* 416 U.S. 802, the court intervened to halt the prosecution in Texas of members of the United Farm Workers Union for, among other offenses, disturbing the peace and unlawful assembly. The court found that law enforcement officers had engaged in harassment arrests of union members in order to break the strike. The harassment had caused members to become fearful of exercising their rights of free expression, association and assembly. Moreover, "[p]otential supporters of their cause were placed in fear of lending their support." (*Id.,* at p. 815 [40 L.Ed.2d at p. 580].)

Similarly, in *Dombrowski* v. *Pfister, supra,* 380 U.S. 479, the high court enjoined state prosecution of the Southern Conference Educational Fund under the unconstitutionally broad Subversive Activities and Communist Control Law and the Communist Propaganda Control Law. The fund was an organization active in promoting civil rights in the South and plaintiffs alleged that arrests and threats of prosecution were being made "without any hope of ultimate success" and for the purpose of discouraging protected activities. (*Id.,* at p. 490 [14 L.Ed.2d at p. 30].)[23]

This court concludes that the authority relied upon by amici is not applicable to the situation presented by this case. Public inebriates are not arrested under section 647(f) for conduct that involves the exercise of constitutional rights. Thus, the arrests are not made with the intent of harassing the arrestees and discouraging exercise of such rights. In short, enforcement of section 647(f) in the County does not result in bad faith arrests.

## V.

Brent N. Rushforth, the taxpayer plaintiff, argues that criminal enforcement of section 647(f) constitutes waste of public funds. He relies on the trial court's findings that civil detoxification is both less expensive than prosecuting chronic alcoholics and more effective in rehabilitating them. In light of these findings, plaintiff argues that enforcement of section 647(f) should be enjoined pursuant to Code of Civil Procedure section 526a (hereafter section 526a).[24]

The trial court rejected this argument. It held that "waste" as used in section 526a "means more than the difference of opinion as to whether the expenditure is a good idea or not." According to the trial court, waste occurs only where "no public benefit can, within the limits of reasonable legislative judgment, be found for the expenditure. If reasonable minds could possibly differ, legislative judgment must prevail and the court may not interfere with it."

---

[23]Many of the "bad faith" cases involve attempts by law enforcement officials to suppress expression protected by the First Amendment. (See *Dombrowski, supra,* 380 U.S. 479; *Allee* v. *Medrano, supra,* 416 U.S. 802; *Cameron* v. *Johnson* (1968) 390 U.S. 611 [20 L.Ed.2d 182, 88 S.Ct. 1335].) They often involve official harassment of adult bookstores or movie theaters. (See *Krahm* v. *Graham* (9th Cir. 1972) 461 F.2d 703; *Universal Amusement Co., Inc.* v. *Vance* (5th Cir. 1977) 559 F.2d 1286; *Black Jack Distributors, Inc.* v. *Beame* (S.D.N.Y. 1977) 433 F.Supp. 1297.)

[24]Section 526a provides, in part, as follows: "An action to obtain a judgment, restraining and preventing any illegal expenditure of, waste of, or injury to, the estate, funds, or other property of a county, town, city or city and county of the state, may be maintained against any officer thereof, or any agent, or other person, acting in its behalf, either by a citizen resident therein, or by a corporation, who is assessed for and is liable to pay, or, within one year before the commencement of the action, has paid, a tax therein. . . ."

Criminal enforcement of section 647(f) does not result in totally unnecessary spending. It provides a public benefit, if only in removing public inebriates from the streets. Therefore, the trial court concluded that the County's decision to enforce section 647(f) criminally does not constitute waste, even if civil detoxification is cheaper, more humane, and more successful in rehabilitating chronic alcoholics. "Section 526a does not allow the judiciary to exercise a veto over the legislative branch of government merely because the judge may believe that the expenditures are unwise, that the results are not worth the expenditure, or that the underlying theory of the Legislature involves bad judgment."

In *Harnett* v. *County of Sacramento* (1925) 195 Cal. 676 [235 P. 445], this court upheld the trial court's order enjoining the Board of Supervisors of Sacramento County from holding an election. The election was enjoined because even if the electorate had approved the ordinance in question, the ordinance was unlawful and could not have been enforced. "Where it is proposed to hold an election for the submission of a measure to the popular vote, and that measure will be wholly void and inoperative even if adopted by the people, the courts may, at the instance of a resident taxpayer, enjoin the holding of the election upon the ground that it will be a useless expenditure and waste of public funds (Code Civ. Proc., § 526a)." (*Harnett, supra,* 195 Cal. at p. 683.)

*Harnett*'s definition of waste as a "useless expenditure of funds" was utilized in *City of Ceres* v. *City of Modesto* (1969) 274 Cal.App.2d 545 [79 Cal.Rptr. 168]. *Ceres* involved a taxpayer's section 526a challenge to the City of Modesto's decision to run sewer lines into an unincorporated territory that was claimed by both the City of Modesto and the City of Ceres. The court in *Ceres* found that the trial court erred in sustaining a demurrer to the taxpayer's claim because it was conceivable that the taxpayer could have amended his complaint to allege that: (1) Modesto would reap no benefit from installation of the sewer lines unless it could annex the unincorporated territory; (2) it was highly unlikely that Modesto would be allowed to annex the territory; and (3) Ceres had commenced proceedings to annex the unincorporated territory and planned to install sewer lines. (*Id.,* at pp. 555-556.) Under these facts, Modesto's extension of sewer lines into the disputed territory would constitute a waste of public funds. (*Id.,* at p. 556.)

In reaching its conclusion that the taxpayer plaintiff should have been given an opportunity to amend his complaint, the court in *Ceres* provided the following definition of waste. ■ "[T]he term 'waste' as used in section 526a means something more than an alleged mistake by public officials in matters involving the exercise of judgment or wide discretion.

To hold otherwise would invite constant harassment of city and county officers by disgruntled citizens and could seriously hamper our representative form of government at the local level. Thus, the courts should not take judicial cognizance of disputes which are primarily political in nature, nor should they attempt to enjoin every expenditure which does not meet with a taxpayer's approval. On the other hand, a court must not close its eyes to wasteful, improvident and completely unnecessary public spending, merely because it is done in the exercise of a lawful power." (*Id.*, at p. 555.)

 Under the rationale of *Ceres*, criminal enforcement of section 526a cannot be considered waste. Plaintiff's allegations and the trial court's findings do not indicate that criminal enforcement of section 647(f) provides no public benefit. They demonstrate only that the civil detoxification alternative would be a more prudent allocation of funds. Therefore, the County's decision to continue arresting and detaining chronic alcoholics does not constitute waste, but merely an "alleged mistake by public officials in matters involving the exercise of judgment or wide discretion." (*Ceres, supra,* 274 Cal.App.2d at p. 555.) This court should not interfere with the County's legislative judgment on the ground that the County's funds could be spent more efficiently.

The Legislature determined that public intoxication is a crime and it offered counties the option of diverting section 647(f) arrestees to civil detoxification facilities in lieu of prosecution. (§ 647(ff).) Although section 647(f) is a valid penal statute, plaintiffs urge this court to override the legislative judgment and effectively decriminalize public intoxication on the ground that civil detoxification is cheaper and more effective than prosecution of public inebriates. This court declines to intrude so far into the legislative prerogative.

## VI.

The judgment of the trial court is affirmed. The cause is remanded for a determination whether County defendants should be enjoined from incarcerating section 647(f) arrestees in prearraignment jail facilities that do not offer medical screening and monitoring by trained personnel.

**GRODIN, J.**—I concur in the judgment. I do not, however, fully accept the characterization of the issues adopted by the majority, nor do I join in the assumption that the principles applicable to sentence and punishment are relevant to pretrial incarceration.

I fully agree with the majority and the dissenting opinion that chronic alcoholism is a serious social problem which the criminal justice system is

ill equipped to address and certainly is incapable of solving. I also agree that public inebriates, and persons believed to be such, do not benefit and in many cases suffer in a prosecutorial system that makes no effort to alleviate the causes which make violation of Penal Code section 647, subdivision (f) inevitable.

Nonetheless, I agree that the law is constitutional and that the validity of the statute is not called into question by the procedures through which it is implemented. Enjoining the enforcement of a valid penal statute to prevent abuses in pretrial detention of arrestees or in proceedings leading to the filing and disposition of charges is not an option available to the court. There is no finding in this case that the arrests for violation of section 647, subdivision (f) are pretextual or that the arresting officers intend or understand that there will be no actual prosecution. Nothing in this record suggests that the arresting officers play any role in the decision to prosecute or in the disposition of the charges.

The judgment of the trial court reflects great sensitivity both to the human problems associated with the arrest and incarceration of alcoholics and to the constitutional rights of the arrestees. I would affirm it in all respects, recognizing that the court has reserved jurisdiction and thus may consider any additional evidence plaintiffs offer regarding the adequacy of medical screening and treatment for arrestees in county detention facilities. Nevertheless, because disposition of this matter requires the concurrence of at least four justices in the order remanding the cause for further proceedings, I concur in the judgment. (*People* v. *Harris* (1984) 36 Cal.3d 36, 71-72 [201 Cal.Rptr. 782, 679 P.2d 433], conc. opn. by Grodin, J.)

Lucas, J., concurred.

**BIRD, C. J.,** Concurring and Dissenting.—Although I concur with much of the discussion in the lead opinion, I write separately to stress the inherent limitations of such a solution. Despite its recognition that criminal processing of public inebriates is dehabilitative, dehumanizing and wholly ineffective, the court fails to order relief to remedy the widespread constitutional violations that permeate the present system.

Every day, individuals are rounded up and crowded into unsanitary facilities, forced to experience the dangerous initial stages of withdrawal with little or no medical attention, and then released. The greater the disease, the more often they are arrested, the more often their constitutional rights are violated, and the more often they are subjected to cruel and inhuman conditions. Treatment of the public inebriate in our criminal justice system

evidences the extent to which courts and law enforcement agencies will sacrifice proper legal procedures in the interests of expediency.

Violations of Penal Code section 647, subdivision (f) alone account for over 30 percent of all misdemeanor arrests effected by the Los Angeles Police Department (LAPD) within the City of Los Angeles.[1] Although a violation of section 647(f) is the highest volume nontraffic crime for which persons are arrested in Los Angeles City and County, virtually none of these arrests result in trials or convictions.[2] In order to fully comprehend how such a unique system developed, we must examine the specialized processing methods utilized by the state to deal with the thousands of arrests made each year.[3]

The typical arrest for public drunkenness begins in the skid row area of downtown Los Angeles.[4] An LAPD footbeat officer circulates in his designated area equipped with a pad of "Short Form Arrest Reports." When an officer finds a person who is apparently unable to care for himself due to his intoxicated condition, a report is filled out. The report consists of physical data identifying the arrestee and a number of boxes to check indicating the presence of certain indicia of intoxication, such as staggering gait, slurred speech, bloodshot eyes.

In the narrative section of the report, the officer enters a short conclusionary statement which invariably reads: "Defendant observed drunk in public unable to care for himself." The names of civilian or law enforcement witnesses are not entered and no attempt is made to preserve circumstantial physical evidence of the alleged violation.

Moreover, unlike the standard arrest procedures employed for other high-volume offenses such as driving under the influence of alcohol (Veh. Code,

---

[1] Penal Code section 647, subdivision (f) provides in pertinent part: "Every person who commits any of the following acts is guilty of disorderly conduct, a misdemeanor: [¶] (f) Who is found in any public place under the influence of intoxicating liquor . . . in such a condition that he or she is unable to exercise care for his or her own safety or the safety of others, or by reason of his or her being under the influence of intoxicating liquor . . ., interferes with or obstructs or prevents the free use of any street, sidewalk, or other public way."

All further statutory references are to the Penal Code unless otherwise noted. For purposes of brevity, section 647, subdivision (f) will be referred to as section 647(f).

[2] The facts incorporated into this opinion are based upon the trial court's findings of fact issued at the conclusion of the trial.

[3] In 1975, the year this action was brought, violations of section 647(f) (where public drunkenness was the *sole* alleged offense) accounted for over 80,000 arrests in Los Angeles County alone.

[4] The largest concentration of arrests for this offense throughout all of Los Angeles County occurs within the downtown central city area.

§ 23152), the officer making a section 647(f) arrest does *not* administer a field sobriety examination or any chemical test for blood/alcohol content. In fact, little investigation, if any, is undertaken by the arresting officer to support his initial impression that the individual is intoxicated. No effort is made to determine if the behavior exhibited by the impaired arrestee is due to illness, fatigue, or medication.[5]

After the arrest, the officer summons a B-wagon to transport the prisoner to the Parker Center jail. B-wagons are vans with windowless, enclosed prisoner compartments and wooden benches. Arrestees may be confined in the B-wagon as long as an hour[6] during transit and there are no toilet facilities. The van is frequently filled beyond reasonable capacity and there is no direct supervision in the prisoner compartment. As a result, prisoners urinate and vomit on the floor (or upon one another if any are unconscious), and fights, thefts, and injuries are commonplace. Even those individuals who were unconscious or semicomatose when arrested are transported in this fashion.

After the arrestee is processed through booking, he is placed in an over-crowded concrete "drunk tank" to await arraignment. No benches, beds, or bedding are provided (although these are available to all other misdemeanor arrestees). Each prisoner must either sit on the floor or stand. There is one toilet for approximately 40 arrestees and no shower. Nutrition is medically insufficient. Two $0.67 meals are served per day, one at 4:30 a.m. and one at 4:30 p.m. A prisoner may, therefore, be in jail for nearly 12 hours before being fed.

Throughout the prearraignment period, section 647(f) arrestees receive no medical screening or monitoring despite the fact that the initial stages of withdrawal occur quite often during that time. Convulsions, seizures, severe nausea and other serious concomitants of withdrawal are not uncommon. Even those prisoners who arrive at the jail unconscious or semicomatose do not receive medical attention. As a result, inebriates have occasionally been found dead during the hourly tank checks made by jail personnel.

At this point in the processing, there are several alternatives available to the arresting authorities. The arrestee may be: (1) released on bail or his own recognizance; (2) referred to a civil detoxification center; (3) released

---

[5]Many of the symptoms of intoxication displayed by advanced alcoholics are also symptoms of other diseases and conditions both related and unrelated to alcoholism. For example, chronic organic brain syndrome can cause lack of controlled speech, and a damaged cerebellum can result in lack of control over bodily movements.

[6]The period of confinement was officially approved by police policy until it was reduced to one-half hour on the eve of trial.

without prosecution pursuant to section 849, subdivision (b)(2) (hereafter section 849(b)(2)); or (4) held for an appearance in municipal court.

The majority of section 647(f) arrestees processed in the Parker Center jail do not qualify for "own recognizance" (OR) release and cannot afford bail.[7] Of the small number who do post bail, most do not appear at the next scheduled court hearing. In such cases, the court generally declares a "bail forfeiture" and the matter is closed. Bench warrants for the arrest of defendants who fail to appear are rarely issued.

There are two statutory alternatives to criminal processing for those section 647(f) arrestees who are unable to post bail or obtain OR release. First, as noted above, the police may refer the inebriate to a civil detoxification center pursuant to section 647, subdivision (ff).[8] However, since there is only one designated facility in Los Angeles County, space is severely limited. On average, the facility can accept only about 13 referrals per day, leaving approximately 145 city arrestees with little hope of treatment.

These statistics clearly demonstrate that the time and locale of the arrest determine whether any particular individual receives a referral. The facility is generally filled to capacity with referrals from the LAPD. As a result, in 1975 and 1976 there were no section 647(ff) referrals from any other place in Los Angeles County despite the fact that the Los Angeles Sheriff's Department made over 20,000 section 647(f) arrests in those 2 years.

The second section 647(f) processing alternative is a prearraignment release (commonly referred to as a "kickout") when "no further proceedings are desirable" pursuant to section 849(b)(2).[9] Until the eve of trial, discretionary release under section 849(b)(2) was utilized by the LAPD only when the drunk tanks became so full that "kickouts" were necessary to relieve the overcrowding.[10] During weekends and holidays when the courts

---

[7] In 1976, approximately 84 percent of those arrested for violation of section 647(f) were still in custody at the time of arraignment.

[8] Section 647, subdivision (ff) (hereafter section 647(ff)) provides in pertinent part: "When a person has violated subdivision (f) of this section, a peace officer, if he or she is reasonably able to do so, shall place the person, or cause him or her to be placed, in civil protective custody. Such person shall be taken to a facility, designated pursuant to section 5170 of the Welfare and Institutions Code, for the 72-hour treatment and evaluation of inebriates."

[9] Section 849(b)(2) states in pertinent part: "Any peace officer may release from custody, instead of taking such person before a magistrate, any person arrested without a warrant whenever: . . . [¶] The person arrested was arrested for intoxication only, and no further proceedings are desirable."

[10] In July of 1977, Special Order 23 was adopted by the LAPD. Under this policy, the use of section 849(b)(2) releases was expanded to compensate for the limited amount of space available in detoxification centers. The new policy ordered the LAPD to continue to arrest public inebriates but to seek prosecution only in exceptional circumstances. Currently, more than 90 percent of all section 647(f) arrestees are released pursuant to section 849(b)(2).

are closed and arraignments unavailable, the time and order of booking, rather than the particular detainee's condition or arrest record, are the sole indicia used to determine whether an individual will be freed or held for arraignment.

Those arrestees who cannot stay in the overcrowded tank[11] are transported to the metropolitan arraignment court and confined pending their appearance. Holding tanks at the arraignment court have unpadded concrete floors, walls, and unpadded wooden benches. Prior to the filing of this action, the tanks were extremely crowded with little, if any, medical attention provided. Section 647(f) prisoners frequently exhibit withdrawal symptoms during this time, and are often still intoxicated, tremulous, and convulsive when brought before the magistrate.[12]

At the beginning of the arraignment proceedings, the magistrate admonishes the group of arrestees *en masse* of their constitutional rights. During the admonitions, municipal court judges and commissioners consistently fail to explain the nature and elements of the offense, to take individual, express waivers of constitutional rights, and to determine whether there is a factual basis for guilty pleas. No notice of the defendants' right to move for a hearing on probable cause is provided. Since the majority of section 647(f) defendants are arraigned without counsel, these procedures are rarely challenged.

The trial court concluded that there has been a "wholesale, almost universal, denial" of the due process right to a proper arraignment. The following example of the type of arraignments that took place in the municipal court illustrates how ludicrous the proceedings often were:

"[The Court:] *Judith Tyronne*. How do you plead?

"Ms. Tyronne: Yes.

"The Court: I didn't hear you. Do you understand?

"Ms. Tyronne: No, May—

"The Court: I can't hear you. How do you plead to the charge that you [were] intoxicated in public?

[11]Prior to the promulgation of LAPD Special Order 23, the vast majority of section 647(f) arrestees were still in custody at arraignment.

[12]Even those public inebriates experiencing delirium tremens and severe seizure episodes were required to appear in court for arraignment.

"Ms. Tyronne: Yes.

"The Court: What? Are you pleading guilty or not guilty?

"Ms. Tyronne: Yes.

"The Court: What? Are you pleading guilty or not guilty?

"Ms. Tyronne: No.

"The Court: Which?

"Ms. Tyronne: No.

"The Court: I will have to have somebody talk to her closer.

"[Unidentified Person]: She wants to go ahead and plead guilty, your Honor. I have been talking to her.

"The Court: All right. She has been in for several days already. It is $50 or two days suspended. Since you have already done several days it will be suspended."

As noted, virtually all section 647(f) filings result in final dispositions without trial. This aberration[13] is primarily accounted for by the discrepancy between jail sentences imposed upon defendants who plead guilty at arraignment and those who remain in custody awaiting trial. At the time this action was filed, the average time served before arraignment ranged from two to eight days. At arraignment, the municipal court almost invariably accepted a plea of "guilty" for a sentence of "time served." By contrast, trial dates for in-custody defendants pleading "not guilty" were set between 21 and 25 days after the date of arraignment. With the certainty that this time will be spent in custody, there is little incentive to proceed to trial.[14]

Another factor contributing to the absence of trials in section 647(f) cases are dismissals ordered by the city attorney pursuant to section 1385 at the

---

[13]In 1974, 99 percent of all section 647(f) defendants entered a plea of guilty. Only 70 percent of defendants charged with other nontraffic misdemeanors pleaded guilty in that year.

[14]Most section 647(f) defendants are homeless or indigent. Therefore, they are unable to post bail or qualify for OR release. A defendant who pleads not guilty will be held in jail awaiting trial and will, of necessity, serve more time than a defendant would serve after a guilty plea. The "option" of pleading guilty is not really a choice at all. The strong compulsion to return to drinking to alleviate the uncomfortable symptoms associated with withdrawal is ever present.

time set for trial.[15] Scheduled trials are dismissed primarily because no evidence of the alleged violation has been preserved, and the arresting officer is unable to independently recall any specific details regarding the circumstances of the arrest. Thus, despite the fact that the defendant has served 20 to 30 days waiting to prove his innocence at trial, the case is dismissed because the state is unable to proceed to trial.[16]

The arrest records of the three named plaintiffs in this action reveal how the right to trial for section 647(f) cases has been abrogated. From 1965 to 1975, plaintiff Robert Sundance was arrested for this offense approximately 176 times and was incarcerated at least 1,470 days, about four years. During the same period, plaintiff Charles Majors was arrested 288 times and was held in custody for over 2,646 days, or about seven years, and plaintiff John Youngblood was arrested 181 times and incarcerated 1,965 days, approximately five years.

These histories vividly demonstrate how the procedures utilized in section 647(f) cases wreak havoc with our notions of due process. "Efficient" police practices routinely lead to the prosecution's inability to meet any standard of proof at trial. Trials are soon dispensed with, and punishment is routinely inflicted without trials.[17] Those arrested never have the opportunity to put the state to its proof, and the entire process from investigation to release is completely shielded from judicial review. In these proceedings the system is turned on its head and those "presumed innocent" serve from three to five times more jail time futilely awaiting trials than those who plead guilty at arraignment.

After an eight-week trial, the trial court issued a memorandum opinion which declared that the "investigative, accusatorial, prosecuting, and judicial policies, practices, and procedures involved in the handling of section 647(f) cases" constituted a "widespread denial of due process of law." Accordingly, declaratory relief was granted. The court ruled that: (1) trials must be set within five days of arraignment; (2) the elements of the offense

---

[15]Section 1385 states in pertinent part: "The judge or magistrate may, either of its own motion or upon application of the prosecuting attorney, and in furtherance of justice, order an action to be dismissed. . . ."

[16]In 1975 and 1976 combined, 2,141 section 647(f) arrestees entered not guilty pleas at arraignment. Seven hundred and twenty-one of these defendants remained in custody an average of 25 days awaiting trial and were subjected to a total of 23,270 days (approximately 64 years) of pretrial imprisonment. Of these in-custody defendants, only two actually received trials.

[17]From the standpoint of the police department, current enforcement practices are the most cost effective. The extraordinarily high volume of section 647(f) cases makes the collection of evidence, listing of witnesses, and recording of circumstances surrounding the arrest expensive and time-consuming.

must be explained to section 647(f) arrestees; (3) express and individual waivers of constitutional rights must be taken on guilty pleas at arraignment; (4) defendants must be informed of their right to a hearing on probable cause; and (5) arrest procedures must meet current due process standards. Injunctive relief was granted only against the city defendants. They were required to provide beds to section 647(f) arrestees, improve transportation conditions, nutrition, and medical monitoring, and administer blood/alcohol tests when requested by medical personnel or when prosecution was contemplated.

The relief granted by the trial court remedies many of the systemic due process violations that pervade the prosecution and hearing of section 647(f) cases. However, these measures are of little benefit to section 647(f) detainees when the section 849(b)(2) procedure continues unabated. Individuals are still arrested, forced to experience the initial stages of withdrawal without medical supervision, and then released. Since there is no formal arraignment, the entire process is insulated from judicial review.

As the trial court noted in its findings regarding the nature and treatment of the disease of alcoholism (see maj. opn. at pp. 1114-1115), the penal system "has no positive effect on rehabilitating alcoholics" and cannot alleviate the continuing compulsion to drink. In fact, the trial court found that the consensus among medical experts is that criminal prosecution of public inebriates may actually perpetuate and exacerbate the underlying illness and the compulsion to drink.

According to the National Council on Alcoholism, "[A]lcoholism is a chronic, progressive and potentially fatal disease. It is characterized by tolerance and physical dependency or pathologic organ changes, or both— all the direct or indirect consequences of the alcohol ingested." As the trial court noted, medical authorities agree that the "loss of control" phenomenon is physiological.

The nature of the illness is such that an alcoholic facing the initial stages of withdrawal will do "anything" to avoid the symptoms that accompany that state. Moreover, once the alcoholic starts drinking, he is physiologically and psychologically unable to control the amount he ingests. The end result for a significant percentage of alcoholics is that they are unable to refrain from drinking to the point where they can no longer care for themselves.

Many of those who are physiologically and psychologically dependent on alcohol are also unable to refrain from appearing in public while intoxicated. Organic brain syndrome, a symptom of advanced alcoholism, may

impair judgment to the point where the individual cannot control his behavior. Others, who are indigent and homeless, may be relegated to drinking in public because there is no other place for them to go.

After considering the testimony of law enforcement personnel, the trial court concluded that "everyone involved in the criminal processing of 647(f) defendants, whether police officer, prosecutor, defense attorney, or judge . . . act in accordance with their beliefs . . . which are, in general, that they are not dealing with a 'real' crime, but are protecting the inebriate from his own illness." As a result, "police procedures are designed with an eye to the reality that repeated incarceration of defendants cannot lead to a cure and is necessary only to protect the defendant from himself . . . . Prosecutors have no desire to do anything but get the defendant enough time in jail to become properly fed, clothed, and sober . . . and hav[e] his urgent medical needs attended to."

This conclusion is bolstered by the fact that the percentage of section 849(b)(2) "kickouts" rose to over 90 percent of the total section 647(f) arrests immediately after the promulgation of LAPD Special Order 23. In fact, the supplemental fact sheet issued with Special Order 23 stated that although "historically, public drunkenness has been treated as a crime . . ., increasing social awareness has resulted in . . . alternatives to criminal prosecution. . . . [However, since] the availability of detoxification center space is very limited . . ., this order expands the use of the [section 849(b)(2)] release procedure so that prosecution . . . will be sought only in exceptional circumstances."

Despite the realization that the methodology used will not accomplish desired social objectives nor aid those individuals who are desperately in need of medical and psychological care, these egregious practices continue unabated. The remedies proposed by the trial court may provide some symptomatic relief, but they do not address the fundamental problem.

The root of the problem is easy to ascertain. Legislative formulations muddle the two justifications for involuntary confinement of individuals suffering from mental illness or substance addiction. For example, under the current statutory scheme, a chronic alcoholic can be detained if "he is unable to exercise care for his own safety or the safety of others . . . ." (§ 647(f).) However, section 647(ff) requires that an individual, who is detained because of public drunkenness, "be placed in civil protective custody" for evaluation and treatment. An analysis of the statutory directives and current law enforcement practices in the 647(f) context points out the inconsistency between these two most frequently noted rationales for in-

voluntary confinement: (1) the provision of care and treatment for the individual and (2) the protection of society.

If the purpose of the commitment is not to punish but to aid the individual in his battle against an illness, then different procedures must be adopted. Under the present scheme, it is clear that there has been little consideration of the notion that confinement based on the need for care and treatment might implicate different rights and concerns from confinement predicated on the need for societal protection. The result is a confusion of statutory purpose in which law enforcement personnel and legislators adopt "treatment" language to approve procedural informality and alternately turn to the rationale of preventive detention when treatment is unavailable.

This type of rationalization perverts the system, frustrates those who are working to change it, and stigmatizes those who are forced to endure it. The case before this court provides a stark illustration. Under the benevolent rubric of care for the sick, procedural constraints are slackened or dropped, and the individual is confined in a situation that provides no treatment and many of the characteristics of preventive detention. The use of criminal processes, facilities, and sanctions are harmful, dehumanizing and dehabilitative. Prisoners are pushed through the revolving door of the criminal justice system again and again, only to suffer pointless, recurrent restraints on their personal liberty and the attendant pain of repeated forced withdrawal, without any hope or prospect of recovery.

Faced with a system which, contrary to public opinion, refuses to decriminalize public intoxication, the courts have no alternative but to ensure that the handling of section 647(f) cases meet all applicable due process standards. As the trial court here commented "[t]he law's answer to the dilemma posed must be that if section 647(f) defendants are to be treated as criminals, all of the constitutional rights of criminal defendants must be respected, regardless of the social desirability of doing something else. If this makes no social sense, such must be brought to the legislators' door . . . ."

Isn't it about time the Legislature addressed this long smoldering scandal? Can a civilized society call itself such if it allows these processes to continue unabated?

In the absence of legislative action, this court must address whether different procedures must be adopted if the purpose of the commitment is to aid the individual in his battle against an illness. Any solution to the problem of inconsistent rationales must begin with an effort on the part of both the courts and the Legislature to distinguish more clearly between the

need for individual treatment and the need for societal protection. Different mechanisms must be developed to channel society's response to each.

"[I]nvoluntary confinement of an individual for *any reason,* is a deprivation of liberty which the state cannot accomplish without due process of law." (*O'Connor* v. *Donaldson* (1975) 422 U.S. 563, 580 [45 L.Ed.2d 396, 410, 95 S.Ct. 2486] (conc. opn. of Burger, C. J.); see *Vitek* v. *Jones* (1980) 445 U.S. 480, 491-492 [63 L.Ed.2d 552, 563-564, 100 S.Ct. 1254]; *Addington* v. *Texas* (1979) 441 U.S. 418, 425 [60 L.Ed.2d 323, 330, 99 S.Ct. 1804].) Whether the state purports to act pursuant to a *parens patriae* interest in promoting the welfare and providing care for those in need of treatment, or pursuant to its police power interest in protecting society, it may not curtail or deny Fourteenth Amendment substantive or procedural due process protections in exercising such powers. (*Project Release* v. *Prevost* (2d Cir. 1983) 722 F.2d 960, 971; see *O'Connor, supra,* 422 U.S. 563, 580 [45 L.Ed.2d at p. 410]; *Specht* v. *Patterson* (1967) 386 U.S. 605, 608 [18 L.Ed.2d 326, 329, 87 S.Ct. 1209].) No degree of illness or diminished capacity alone can serve to undermine the protections afforded an individual's liberty interest in this area. (See *Project Release, supra,* 722 F.2d 960, 971.)

Thus, if the state intends to confine someone solely for the protection of others, it must do so under statutes with clearly delineated standards and procedures which mirror those found in the criminal process.[18] When the need for societal protection is not asserted and procedure is slighted nevertheless, only the provision of rehabilitative treatment for the person confined can justify detention. If confinement is undertaken for the purpose of providing care, then the absence of such treatment violates the individual's due process entitlement.

As the United States Supreme Court commented when it addressed the issue of custodial confinement of the mentally ill: *"there is still no consti-*

---

[18]Confinements executed with traditional criminal safeguards are not exempt from complying with established standards for the provision of medical and psychological care. The United States Supreme Court in *Estelle* v. *Gamble* (1976) 429 U.S. 97, 103-104 [50 L.Ed.2d 251, 259-260, 97 S.Ct. 285], stressed the importance of providing such care: "These elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration. An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met. In the worst cases, such a failure may actually produce physical 'torture or a lingering death' . . . . [Citation omitted.] In less serious cases, denial of medical care may result in pain and suffering which no one suggests would serve any penological purpose. [Citation omitted.] The infliction of such unnecessary suffering is inconsistent with contemporary standards of decency as manifested in modern legislation codifying the common-law view that 'it is but just that the public be required to care for the prisoner, who cannot, by reason of the deprivation of his liberty, care for himself.'" (Fn. omitted.)

tutional basis for confining such persons involuntarily if they are dangerous to no one and can live safely in freedom. . . . [¶] In short, a State cannot constitutionally confine without [treatment] a nondangerous individual who is capable of surviving safely in freedom by himself . . . ." (*O'Connor, supra,* 422 U.S. 563, 575-576 [45 L.Ed.2d 396, 407].)

In the present case, as noted above, not only are the procedures seriously deficient, but the belief is pervasive among law enforcement personnel that public drunkenness does not constitute a "real" crime. In fact, the design for the current procedures was based on the recognition that repeated incarceration could not realistically be considered a cure and, therefore, would serve only as a means of protecting the inebriate from his own illness.

Ironically, although the disease of alcoholism and its attendant manifestations are the justifications proffered for the form of preventive detention currently utilized by the LAPD, the illness and its acute medical complications are uniformly ignored once the inebriates are confined in the drunk tanks. Medical supervision is grossly insufficient and counseling is almost never provided. In addition, since meals are served only at 4:30 a.m. and 4:30 p.m., many detainees may be held for up to 12 hours without receiving any food at all. Perhaps the most inhumane facet of the section 849(b)(2) process is the fact that the detainees are frequently released at the most dangerous stage of the withdrawal process.[19]

As the record in this case more than adequately demonstrates, there is no meaningful opportunity for these individuals arrested under section 647(f) and released pursuant to section 849(b)(2) to contest the charge or otherwise be heard in any judicial forum. Accordingly, utilization of preventive detention and the section 849(b)(2) release procedure by the LAPD can be deemed to serve no other purpose than protective custody.

Moreover, section 647(ff) specifically mandates that public inebriates be placed in "civil protective custody" whenever possible. In light of this express purpose,[20] those individuals who are confined under section 647(f), forced to undergo withdrawal, and then released several hours later, must

---

[19]The cycle, moreover, does not end at this point. As the record clearly demonstrates, many inebriates may be arrested more than once in a single day and thus be forced to endure this humiliating process time and time again. The trial court held that this process is actually dehabilitative.

[20]The explicit statement of this policy in LAPD Special Order 23 and the extensive testimony of law enforcement personnel provide more than adequate support for this characterization of the process.

be provided with the same due process rights afforded individuals in the context of involuntary civil and quasi-criminal commitments.[21]

The existence of a constitutional right to care and treatment for persons involuntarily confined is no longer a novel proposition. The notion of a due process right to treatment was first advanced by Chief Judge Bazelon in *Rouse* v. *Cameron* (D.C.Cir. 1966) 373 F.2d 451. Although the decision was based on a District of Columbia statutory provision, Judge Bazelon suggested that involuntary institutionalization without "adequate treatment" involved a constitutional infringement of liberty. (*Id.*, at p. 455.)

Since that decision, our courts have addressed at length the rights of individuals who have been involuntarily confined. In *Wyatt* v. *Stickney* (M.D.Ala. 1971) 325 F.Supp. 781, affirmed in part and remanded in part *sub nom. Wyatt* v. *Aderholt* (5th Cir. 1974) 503 F.2d 1305, Judge Bazelon's dictum was applied and the court found a *constitutional* right to treatment for involuntarily committed mental patients. The *Wyatt* v. *Stickney* court held that confined patients "unquestionably have a constitutional right to receive such individual treatment as will give each of them a realistic opportunity to be cured or to improve his or her mental condition." (*Id.*, at p. 784.) Chief Judge Johnson then succinctly articulated the doctrinal basis for the newly recognized right: "*[t]o deprive any citizen of his or her liberty upon the altruistic theory that the confinement is for humane therapeutic reasons and then fail to provide adequate treatment violates the very fundamentals of due process.*" (*Id.*, at p. 785, italics added.)

The theory of a federal right to treatment rooted in the due process clause was fully developed in *Donaldson* v. *O'Connor* (5th Cir. 1974) 493 F.2d 507. In that case, the plaintiff had been involuntarily incarcerated in a state-owned-and-operated mental institution for nearly 15 years. Uncontradicted testimony indicated that he was not dangerous and could survive responsibly on his own or with the aid of others. During his incarceration, he received virtually no treatment. (*Id.*, at pp. 510-511, 517.)

According to the *Donaldson* court, any intrusion on an individual's freedom must be justified on the basis of a permissible governmental goal. Where the state's purpose in committing an individual is to care for him,

---

[21]This court has repeatedly recognized the dual nature of any proceedings that impose involuntary confinement upon individuals for their own safety and the safety of others. (See, e.g., *People* v. *Thomas* (1977) 19 Cal.3d 630 [139 Cal.Rptr. 594, 566 P.2d 228]; *People* v. *Burnick* (1975) 14 Cal.3d 306 [121 Cal.Rptr. 488, 535 P.2d 352].) Defendant's system of enforcing section 647(f) can only be described as quasi-criminal—because arrestees are detained for violating a criminal statute—and quasi-civil—because none of the requisites of criminal procedure are followed and no criminal proceedings are even contemplated.

treatment must be provided. (*Id.,* at pp. 520-521; *Jackson* v. *Indiana* (1972) 406 U.S. 715 [32 L.Ed.2d 435, 92 S.Ct. 1845]; see Note, *The Constitutional Right to Treatment Services for the Noncommitted Mentally Disabled* (1980) 14 U.S.F. L.Rev. 675.) Absent such treatment, the nature of the commitment bears no relationship to its purpose and, therefore, violates the individual's due process rights. (*Donaldson, supra,* 493 F.2d at p. 521.)

On review, the United States Supreme Court declined to rule expressly on the issue of the right to treatment. Instead, the court chose to focus on the liberty interest of the confined individual. It ruled that the state could not properly retain without treatment a nondangerous individual in its custodial care who had shown himself capable of surviving in freedom. (*O'Connor* v. *Donaldson, supra,* 422 U.S. at p. 576 [63 L.Ed.2d at p. 407].) In doing so, the court implicitly incorporated into the constitutional right of liberty many of the essential characteristics of the federal right to treatment. Shortly after its ruling in *O'Connor,* the Supreme Court denied certiorari in the case of *Burnham* v. *Department of Public Health of the State of Georgia* (5th Cir. 1974) 503 F.2d 1319, certiorari denied *sub. nom. Department of Human Resources of Georgia* v. *Burnham* (1975) 422 U.S. 1057 [45 L.Ed.2d 709, 95 S.Ct. 2680]. In *Burnham,* the Fifth Circuit relied on its earlier ruling in *Donaldson* to overrule a district court which had refused to recognize the constitutional right to treatment. (See *Burnham* v. *Department of Pub. Health of State of Ga.* (N.D. Ga. 1972) 349 F.Supp. 1335, 1341-1343.)

In the wake of these decisions, the overwhelming majority of federal courts have accepted and enforced the constitutional right to treatment. (*Woe* v. *Cuomo* (2d Cir. 1984) 729 F.2d 96, 104; *United States* ex rel. *Schuster* v. *Herold* (2d Cir. 1969) 410 F.2d 1071, 1087-1089, cert. den. 396 U.S. 847 [24 L.Ed.2d 96, 90 S.Ct. 81]; *Harper* v. *Cserr* (1st Cir. 1976) 544 F.2d 1121; *Bowring* v. *Godwin* (4th Cir. 1977) 551 F.2d 44, 48, fn. 3; *Welsch* v. *Likins* (8th Cir. 1977) 550 F.2d 1122, 1126, fn. 6; *Doe* v. *Public Health Trust of Dade County* (11th Cir. 1983) 696 F.2d 901, 902-903; *Davis* v. *Watkins* (N.D. Ohio 1974) 384 F.Supp. 1196, supplemented *sub. nom. Davis* v. *Hubbard* (N.D. Ohio 1980) 506 F.Supp. 915; *Evans* v. *Washington* (D.D.C. 1978) 459 F.Supp. 483, 484; *Ass'n for Retarded Citizens of North Dakota* v. *Olson* (8th Cir. 1983) 713 F.2d 1384, 1392-1393; *Scott* v. *Plante* (3d Cir. 1981) 641 F.2d 117, vacated and remanded (1982) 458 U.S. 1101 [73 L.Ed.2d 1362, 102 S.Ct. 3474], original order affd. (3d Cir. 1982) 691 F.2d 634.)

Although *O'Connor, supra,* 422 U.S. 563 by its terms applied only to committees who are nondangerous and capable of surviving in freedom, subsequent federal cases have extended the right-to-treatment principle to

dependent and dangerous committees as well. (*Flakes* v. *Percy* (W.D. Wis. 1981) 511 F.Supp. 1325, 1337-1339 (convicted sexual offenders); *Davy* v. *Sullivan* (M.D. Ala. 1973) 354 F.Supp. 1320 (criminally committed sexual psychopath); *Nelson* v. *Heyne* (7th Cir. 1974) 491 F.2d 352, 360, fn. 13 (incarcerated juveniles), cert. den. 417 U.S. 976 [41 L.Ed.2d 1146, 94 S.Ct. 3183].) As the Ninth Circuit recently emphasized, even sex offenders who are confined on the basis of findings that they have "'a mental or emotional disturbance, deficiency or condition, predisposing [them] to the commission of [certain sex offenses involving minors] to a degree rendering [them] a menace to the health and safety of others'" nonetheless have a constitutional right to treatment. (*Ohlinger* v. *Watson* (9th Cir. 1981) 652 F.2d 775, 776, fn. 2, 777.)

Similarly, this court has ruled that both individuals who have been deemed nondangerous and those who remain dangerous have a right to treatment. In *People* v. *Feagley* (1975) 14 Cal.3d 338, 375-376 [121 Cal.Rptr. 509, 535 P.2d 373], this court held that the involuntary commitment of a mentally disordered sex offender, without the provision of more than custodial care, violated both the federal and state constitutional proscriptions against cruel and unusual punishment.

More significantly, as the Ninth Circuit noted recently in a decision addressing the constitutionality of certain provisions of the Lanterman-Petris-Short Act [hereafter LPS],[22] involuntary confinement to a mental facility for even *extremely short periods of time* constitutes "'a massive curtailment of liberty'" which requires strict due process protections. (*Doe* v. *Gallinot* (9th Cir. 1981) 657 F.2d 1017, 1021.)[23]

In fact, the substance of the provisions of the LPS act clearly demonstrates that the Legislature recognizes this state's obligation to provide treatment services for our disabled citizens. In the opening section of the LPS act, the Legislature has declared that it is the state's responsibility to provide prompt evaluation and individualized treatment for persons with serious disorders or impaired by chronic alcoholism. (Welf. & Inst. Code, § 5001, subds. (b), (c).) Moreover, the state must also "encourage the full use of all existing agencies, professional personnel and public funds to accomplish these objectives . . . ." (*Id.,* subd. (f).)[24]

---

[22]See Welfare and Institutions Code sections 5000-5466.

[23]Similarly, in the recent case *Doe* v. *Public Health Trust of Dade County, supra,* 696 F.2d 901, 902-905, the Eleventh Circuit held that a voluntary, minor mental patient who had been confined for approximately two months had a viable claim for violation of her constitutional right to treatment.

[24]In addition, section 5622 of the Welfare and Institutions Code requires the state to develop after-care programs for mentally disturbed or disabled persons released from a state hospital or a community treatment facility. It is clear that the Legislature intended by this provision "to assure continuity of care as a patient moves from an inpatient facility back into the community." (Stats. 1974, ch. 566, § 1, p. 1384.)

Thus, the constitutional right to treatment for persons committed to protective custody has evolved as a consequence of both decisional authority and legislative expression. If justification for involuntary confinement rests, even in part, upon the need for care and treatment of an individual, then the state which confines must also provide treatment. (See *Woe* v. *Cuomo, supra,* 729 F.2d 96.) Both precedent and logic dictate that chronic alcoholics detained under section 647(f) must be confined in detoxification facilities where they can receive the minimum requisites of proper treatment and rehabilitation services.

In the present case, the trial court stated that "[t]he evidence showed without contradiction that neither in the city or county jail is an attempt made to treat a public inebriate for his 'alcoholism,' as distinguished from treating such defendant for acute medical problems caused by alcoholism . . . [H]owever in actuality . . . the procedures in the city jail do not [even] provide [the] minimum necessary medical treatment [for] the acute phases of detoxification . . ." or any other problems associated with the illness "unless there is something obviously wrong on a cursory examination by a booking sergeant or where the defendant himself is in sufficient command of his [faculties] to ask for medical help."

In the last 10 years, the treatment of alcoholism has progressed substantially. As the trial court noted, the recognition among a majority of states that the "jail custodial setting is not appropriate for treatment of . . . alcoholic[s]" has engendered the development of successful alternatives to criminal processing. Alcoholism is now perceived as a treatable disease that can be managed with proper medical care, psychological support, and education. As a result, many states have decriminalized public intoxication and have mandated placement in civil detoxification facilities.

Despite its recognition that criminal processing is not only ineffective but also detrimental to the detainees, the trial court ordered only piecemeal relief to remedy the many egregious due process violations. These measures are of little benefit to any detainee, since the procedural guidelines promulgated by LAPD Special Order 23 continue unabated.

Any attempt to deal with these individuals in a manner which affords them some dignity and does not violate their constitutional rights clearly cannot be restricted to the context of the criminal justice system. The relief ordered by this court cannot possibly affect the daily injustices perpetrated by defendants' "criminal detoxification system."

The brand of protective custody fostered by the LAPD's utilization of the section 849(b)(2) "kickout" provision is constitutionally intolerable. In

refusing to enjoin continued enforcement of section 647(f) and to mandate referral of chronic alcoholics to civil detoxification facilities under section 647(ff), this court should not give judicial sanction to such a gross misuse of the penal system.

Plaintiffs have clearly demonstrated that referral to civil detoxification facilities is essential to the effective treatment and care of chronic alcoholics. Therefore, if the state's goal is, in part, to provide care for those chronically ill as a result of their addiction, then adequate treatment *must be provided.* (See *Woe* v. *Cuomo, supra,* 729 F.2d 96.)

Reynoso, J., concurred.

The petition of defendants and respondents for a rehearing was denied February 5, 1987.